COAST CITIES TRUCK SALES,
INC.; Plaintiff,

v.

NAVISTAR INTERNATIONAL TRANS-
PORTATION CO.; Navistar Financial
Corp.; Harco National Insur. Co.; De-
fendants,

v.

COAST CITIES LEASING, INC.; Douglas
M. Gallagher; Arlene Gallagher; Thom-
as Gallagher; Dorothy A. Gallagher;
Counterclaim Defendants.

Civ. No. 92–0886 (GEB).

United States District Court,
D. New Jersey.

Dec. 29, 1995.

748

754

Alan S. Fellheimer, Fellheimer & Eichen, P.C., Camden, NJ, for Coast Cities Truck Sales, Inc.

Ezra D. Rosenberg, Dechert, Price & Rhoads, Princeton, NJ, for Navistar International Transportation Company.

John Vena Fiorella, Archer & Greiner, P.C., Haddonfield, NJ, Ezra D. Rosenberg, Dechert, Price & Rhoads, Princeton, NJ, for Navistar Financial Corporation.

John Vena Fiorella, Archer & Greiner, P.C., Haddonfield, NJ, for Harco National Insurance Company.

## MEMORANDUM OPINION

BROWN, District Judge.

This matter comes before the Court on the motions of defendants, Navistar International Transportation Company ("NITC"), Navistar Financial Corporation ("NFC") and Harco National Insurance Company ("Harco"), for summary judgment pursuant to FED. R.CIV.P. 56. Also before the Court is the motion by plaintiff Coast Cities Truck Sales, Inc. ("Coast Cities") for summary judgment on Count VI of the Second Amended Com-

plaint. Additionally, counterclaim plaintiffs NFC and Harco seek summary judgment on Counts I and II of the Counterclaims, against counterclaim defendants Coast Cities Leasing, Inc., Douglas M. Gallagher, Arlene Gallagher, Thomas Gallagher and Dorothy A. Gallagher. For the reasons set forth in this Memorandum Opinion, the Court will grant defendants' motions for summary judgment against Counts I, II, III, IV, V, VII and VIII of the Second Amended Complaint, and will grant summary judgment in favor of counterclaim plaintiffs NFC and Harco on Counts I and II of the Counterclaims. As to Count VI of the Second Amended Complaint, which alleges that NITC violated the New Jersey Franchise Practices Act, the Court will deny the parties' cross-motions for summary judgment, and will abstain from adjudication of this matter pursuant to *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

## I. BACKGROUND

Plaintiff Coast Cities has been a dealer of medium- and heavy-duty trucks for over thirty years, primarily serving central New Jersey. Defendant NITC assembles and sells medium-duty and heavy-duty trucks, sold under the "International" trademark, on a nationwide level. Defendant NFC is a wholly owned subsidiary of NITC that provides wholesale financing to NITC dealers and retail financing to retail purchasers of NITC dealers. Harco National Insurance Company is a wholly owned subsidiary of NFC that provides commercial insurance to truck dealers, and casualty and liability insurance to motor vehicle owners and operators.

Coast Cities was an authorized dealer of International trucks from 1962 to 1992. From 1980 to 1988, Coast Cities enjoyed tremendous success from its sales of new and used trucks, parts and warranty services. Its revenues climbed from $4.003 million in 1980, to $20.765 million in 1988. Between 1988 and 1991, however, the company's sales revenues sharply declined, falling to $6.614 million in 1991. The dropoff in revenue

seemed to stem exclusively from the decline in truck sales, which declined dramatically from $18.587 million in 1988 to $7.968 million in 1990, rather than from parts and service sales, which increased from $2.177 million in 1988 to $2.367 million in 1990.

On November 9, 1987, NITC and Coast Cities entered into a Dealer Sales/Maintenance Agreement ("Dealer Agreement"). The Dealer Agreement provided that Coast Cities would continue as an authorized dealer of International trucks, and that Coast Cities in turn would pay for goods sold to it by NITC, in accordance with certain credit terms set by NITC and NFC. *See* Dealer Agreement, attached as Exh. C to Certification of Ronald J. Smith ("Smith Certif."), at 9. *See also* Retail Financing Agreement, attached as Exh. D to Affidavit of Robert D. Bradley ("Bradley Aff."). The Dealer Agreement also stated that NITC could terminate the agreement or place Coast Cities on cash-on-delivery ("C.O.D.") status if Coast Cities "default[ed] in the payment of any obligations owing to Navistar or to any affiliate of Navistar, or upon demand fails to account for the proceeds of the sale of goods for which it is indebted to Navistar or to any affiliate of Navistar...." *Id.* at 16. Pursuant to the Dealer Agreement, NFC maintained an Open Account, which is a running balance of credits and debits between NITC/NFC/Harco and each International dealer. Items such as accounts payments by the dealer to NITC, payments by NITC for parts and labor, payments for warranty work, and parts returns by the dealer would be posted as credits. Debits consisted of charges for goods and services purchased by the dealer from NITC. The balance due on the Open Account is payable to NFC every month.[1] Pursuant to the Dealer Agreement, NITC may elect to place a dealer on C.O.D. status if payment on a balance is not made by the end of the succeeding month. *Id.* C.O.D. status means that the dealer loses all credit privileges and that all purchases from NITC must be for cash.

---

**1.** The Dealer Agreement provided that NITC could reassign and place for collection with NFC

any debt that Coast Cities owed NITC.

Coast Cities' problems with falling revenues began to manifest in 1989. On July 21, 1989, NFC informed Coast Cities that the payable balance on its Open Account was $186,991.06, and warned that it would place Coast Cities on C.O.D. status unless the balance was completely satisfied by August 4, 1989. Smith Certif.Exh. A. On November 15, 1989, NFC advised Coast Cities that the latter had been placed on C.O.D. status, because two checks Coast Cities submitted to NFC, for a total of $59,208.88, had been returned for insufficient funds. Coast Cities was removed from C.O.D. status on February 27, 1990. Affidavit of Robert D. Bradley ("Bradley Aff.") ¶ 15. On May 9, 1990, NFC again placed Coast Cities on C.O.D. status, until May 17, 1990. Id. ¶ 16. On July 2, 1990, NFC again placed Coast Cities on C.O.D. status, until July 18, 1990. Id. ¶ 17. On February 25, 1991, NFC again placed Coast Cities on C.O.D. status because of an Open Account balance of $218,448.75 and because two checks remitted by Coast Cities, in the amount of $80,000.00, had been returned for insufficient funds. See Exh. C to Bradley Aff. On April 29, 1991, Coast Cities' financier, Associates Commercial Corporation ("Associates"), advised NITC that a federal tax lien had been imposed against the dealership, and that Associates consequently had suspended wholesale and retail financing for Coast Cities. Smith Certif.Exh. B.

As of May 20, 1991, Coast Cities' Open Account balance was $196,712.86. On that date, NITC told Coast Cities that the latter's indebtedness to NFC constituted a breach of the Dealer Agreement, and gave Coast Cities thirty days within which to cure the breach. NITC also advised Coast Cities that failure to cure the breach would result in termination of the Dealer Agreement. On June 10, 1991, Coast Cities requested from NITC an additional 120 to 180 days to cure the breach. Ultimately, the parties agreed to extend the cure period to October 20, 1991.

However, Coast Cities' fiscal problems worsened. On October 22, 1991, NFC informed Coast Cities that its Open Account balance was approximately $300,000.00, and that NFC intended to pursue legal action. Coast Cities responded that it had retained

an accounting firm to determine its business viability and that a formal report would be completed by November 25, 1991. NITC then agreed to extend the cure period, contingent upon Coast Cities submitting monthly financial and operating statements and a specific business plan by December 1, 1991. Smith Certif.Exh. K.

On January 13, 1992, NITC was advised that another tax lien had been filed against Coast Cities, and that Associates had again suspended Coast Cities' floor plan financing. Id. Exh. M. As of February 21, 1992, Coast Cities had not responded to NITC's January 3, 1992 request to discuss particulars of the business plan. Consequently, NITC notified Coast Cities that it was terminating the Dealer Agreement, effective April 27, 1992. Id. Exh. N. NITC asserts that the termination was due to Coast Cities' Open Account balance of $122,803.59, and miscellaneous debts totalling approximately $31,100.32. Id. See also Bradley Aff. ¶ 22.

Coast Cities sought to enjoin termination of the Dealer Agreement by filing a Complaint before this Court on February 25, 1992, and an application for injunctive relief on April 10, 1992. See Exh. P to Affidavit of Ezra D. Rosenberg ("Rosenberg Aff."), at 2–8 to 2–13; 2–25 to 3–5. The parties agreed to suspend actual termination of the Dealer Agreement pending the Court's decision on Coast Cities' application. Id. at 3–12 to 3–22. On May 14, 1992, the Court denied Coast Cities' application for injunctive relief. Id. at 24–20 to 25–25. The Dealer Agreement was therefore terminated. Coast Cities then filed for protection under Chapter 11 of the Bankruptcy Code, and brought an adversary action against NITC, again seeking injunctive relief to revive the Dealer Agreement. Specifically, Coast Cities sought declaratory judgment that the Dealer Agreement was an existing executory contract under 11 U.S.C. § 365, or in the alternative, recovery of the Dealer Agreement under 11 U.S.C. § 548 as a "fraudulent transfer."

The bankruptcy court issued temporary restraints and a preliminary injunction against NITC on July 6, 1992 and September 2, 1992, which essentially compelled NITC to continue to perform under the Dealer Agree-

ment. However, this Court reversed the decision of the bankruptcy court on December 2, 1992. *See In re Coast Cities Truck Sales, Inc.*, 147 B.R. 674 (D.N.J.1992). The United States Court of Appeals for the Third Circuit subsequently affirmed this Court's December 2, 1992 decision. *See In re Coast Cities Truck Sales, Inc.*, 5 F.3d 1488 (3d Cir.1993).

NITC competes on a nationwide level against several other manufacturers and assemblers of medium- and heavy-duty trucks, including Paccar (manufacturer of the Peterbilt and Kenworth brands), Freightliner, Volvo/White/GMC, Ford and Mack. Additionally, foreign manufacturers such as Mitsubishi, Isuzu, Nissan and Hino compete in the medium-duty truck market. Affidavit of Wayne Krzysiak ¶ 4. NITC has held between 25.4% and 29.9% of the market since 1981, while Ford has held between 15.8% and 24.4% and GMC has held between 10% and 23.4% of the market. *Id.* ¶ 5. NITC avers that its trucks do not differ substantially from those of its competitors in terms of intended uses and the types of customers, but that a manufacturer's or assembler's success in the market depends on comparative features and prices, the proximity of the dealer, and the services they offer. *Id.* ¶ 6.

NITC's nationwide distribution network is organized into five regional offices. *Id.* ¶ 8. It uses the same Dealer Agreement for all dealers, and thus allows each authorized International dealer to use the tradename to sell new trucks, parts and warranty services. *Id.* ¶ 9.

There are currently 400 International dealers. *Id.* ¶ 10. Approximately 380 of these dealers are "private capital" dealers, which means that the dealerships are wholly owned and operated by individuals who, except for the Dealer Agreement, are not affiliated with NITC. Approximately sixteen of the other dealers are "dealcors." *Id.* A dealcor is an International dealership that is initially owned and funded entirely by NITC, and supervised in its daily operations by a private

manager. *Id.* ¶ 12. NITC retains ownership of all voting shares in the dealcor, while the manager is allotted a limited number of non-voting shares. *Id.* However, the manager usually has the option, or even a contractual obligation, of applying bonuses, which are based on the dealcor's profits, toward buying out NITC's interest in the dealcor. *Id.* NITC's predecessor, International Harvester, first established dealcors in 1956 to maintain a market presence in areas it considered potentially lucrative, but for which it was unable to find a private capital dealer. *Id.* ¶ 13. The dealcors have also served as a means by which NITC can revive a previously financially failed dealership. *Id.*

NITC estimates that it has established approximately 300 dealcors. *Id.* ¶ 14. "Of the approximately 400 private capital dealers in existence today, 100 of them were once dealcors." *Id.* NITC asserts that it now seeks to establish private capital dealerships rather than dealcors, and that it is likely to create a dealcor only if necessary to replace a financially failed dealership. *Id.* ¶ 16. For example, NITC asserts, it is currently looking for a private capital dealer to replace Coast Cities and Faulkner International in Philadelphia, Pennsylvania, and will resort to establishing dealcors only if its searches are unsuccessful. *Id.* ¶ 20.

NITC's presence in New Jersey has fluctuated over the past twenty years. While NITC at one time had thirty International dealerships in the state, it presently has six.[2] Moreover, while there were six factories in New Jersey in the 1970s, all of these had closed by 1994.

NITC also sells trucks and parts directly to end-users, which often include "national fleet accounts." A national fleet account is a large volume purchaser, the sales to which NITC competes with the other truck manufacturers. Given the competition for this business and the significant sales volume, NITC and the other manufacturers are likely

---

2. The six authorized International dealers presently operating in New Jersey are as follows: (1) Deluxe International in Bergen County; (2) Freedman International in Middlesex County; (3) Opdyke's in Washington; (4) Bergen Auto Part in South Hackensack; (5) Freedom International in Philadelphia, Pennsylvania; and (6) Mid Atlantic International in Linden. Krzysiak Aff. ¶¶ 19, 21. The first four dealers are private capital dealers, while the latter two are dealcors. *Id.*

to sell to a national fleet account at reduced prices. NITC's direct sales to national fleet accounts also allow it to provide a nationwide support system that an individual dealer could not provide.

In New Jersey, the major fleet accounts consist of the State of New Jersey, National Freight, Biddle, RJR Nabisco, APA Leasing and Airco Gases. Affidavit of Michael Cancelliere ¶ 7. NITC asserts that some sales to fleet accounts in New Jersey benefitted Coast Cities, because NITC gave monetary credits, called "Fleet Leader Credits," to the dealer in whose area of responsibility ("AOR") the national fleet account was head-quartered and to the dealer in whose AOR the new trucks were delivered. See Rosenberg Aff.Exh. B. Therefore, Coast Cities would receive full fleet leader credits for sales to fleet accounts headquartered in Monmouth or Ocean County, if the trucks were delivered there, and would receive partial fleet leader credits if the fleet account was not headquartered in its AOR, but the trucks were delivered there.

Although NITC manufactures some of its own parts, it purchases most of the parts used in the assembly of trucks from hundreds of component manufacturers pursuant to non-exclusive licenses. NITC sells its parts wholesale to both private capital dealers and dealcors, which sell parts to end-users. Affidavit of Stephen Koch ("Koch Aff.") ¶ 3. NITC also sells a small percentage of total parts directly to retail customers such as national fleet accounts and original equipment manufacturers. Id. There also exists a significant aftermarket—i.e., manufacturers and distributors of replacement parts other than the original manufacturer—for parts compatible with International trucks. Rosenberg Aff.Exh. B. In other words, the numerous manufacturers of parts sold to NITC also sell those parts to other distributors. Id. These observations reflect that many truck components and parts are interchangeable among different brands of trucks. Koch Aff. ¶ 4.[3]

NITC itself does not sell or provide warranty repair services. Instead, it remunerates its dealers, both private capital and dealcors, for performing warranty repair services. Krzysiak Aff. ¶ 29. It is apparent that International customers requiring warranty repair work are most likely to bring the vehicle to the nearest authorized International dealer. See, e.g., Rosenberg Aff.Exh. B. But if a dealer is placed on C.O.D. status, and therefore can not obtain necessary parts within a reasonable time period, the customer may have to bring the vehicle to another dealer.

NITC sells its trucks to dealers at the same list prices nationwide. Dealers may seek, however, discounts from the list price by providing the identity of the prospective customer and the number and types of vehicles to be sold. These discounts are collectively termed "Special Price Assistance" ("SPA"), and NITC will provide the same SPA to any other dealers attempting to reach that same deal, regardless of the dealers' locations. See Krzysiak Aff. ¶ 34.

The list prices at which NITC sells parts are also the same for all dealers nationwide. NITC does, however, negotiate separate deals for parts sold to certain fleet accounts, depending on the volume of parts purchased. NITC dealers also sell parts to the national fleet accounts at prices not to exceed the prices at which NITC charges the fleet accounts. Additionally, NITC dealers may seek SPA on parts sales. SPA on parts is provided to all dealers on the same basis, and again is contingent on the volume and types of parts to be sold. Koch Aff. ¶ 8.

While there is no dispute that Coast Cities sold International new and used trucks and parts, and provided warranty repair services for which it was remunerated by NITC, the parties disagree as to the relevant product market. Plaintiff offers several inconsistent theories,[4] but essentially argues in each that

---

3. Between 1981 and 1993, the sales totals for the entire parts industry in the United States ranged from $6.6 billion to $7.4 billion. NITC has sold roughly 6% to 8% of that amount. Koch Aff. ¶ 4.

4. Plaintiff is not clear in expressing what it considers to be the relevant product market. First, it asserts that "[t]here are four interrelated components of Coast Cities' business, each of which constitutes a product market: (1) new truck sales, (2) used truck sales, (3) service (warranty

NITC product by itself constitutes the relevant market. Defendant NITC disputes this definition, and contends that it competes with other manufacturers, including Ford, GMC, Paccar, and other national and international truck manufacturers and assemblers. The parties also disagree on the relevant geographic market of Coast Cities. Initially, Coast Cities' AOR consisted of all of Ocean County, New Jersey and southern Monmouth County, New Jersey. Rosenberg Aff. Exh. B. By the mid–1980s, NITC had closed or otherwise terminated two dealerships, L & H Truck Sales in Lakewood, New Jersey and Schwartz International in Red Bank, New Jersey, and assigned those areas to Coast Cities. *See id.* Thus, from 1986 until termination of the Dealer Agreement in 1992, Coast Cities' AOR consisted of the entirety of Monmouth and Ocean Counties. *See id. See also* Krzysiak Aff. ¶ 12.

Defendants assert that during throughout the 1980s and until termination of the dealership, Coast Cities rarely competed outside of its AOR with other International dealers. Moreover, defendants aver that the Court can not look solely to New Jersey as the relevant geographic market, because NITC, the alleged antitrust infringer, competes with other manufacturers and assemblers of trucks and parts on a nationwide basis. Plaintiff asserts, however, that its relevant geographic market included all of Central and Southern New Jersey, because given the location of other authorized International dealers in New Jersey and Pennsylvania, prospective purchasers in the central and southern parts of New Jersey (in addition to Ocean and Monmouth Counties) and the surrounding Pennsylvania regions, would look to Coast Cities to buy International trucks and parts. Thus, while defendants characterize the relevant market on a nationwide level, and limit Coast Cities' scope to its AOR of Ocean and Monmouth Counties, plaintiff asserts that its scope expanded well beyond Monmouth and Ocean Counties, to include all of Central and Southern New Jersey, but that it would be erroneous to consider the relevant geographic market on a national level because its customers did not purchase International products nationally.[5]

Other facts germane to the state law claims brought by plaintiff are discussed as necessary to resolve each of Counts III through VII. Similarly, the facts relevant to adjudication of the counterclaims are discussed in section II(J) of the Memorandum Opinion.

Count I of the Complaint alleges that defendants conspired to restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 *et seq.* Second Amended Complaint ¶¶ 37–38. Count II of the Complaint alleges that defendants monopolized, attempted to monopolize and conspired to monopolize trade in violation of § 2 of the Sherman Act. *Id.* ¶¶ 40–43. Count III alleges that defendants deliberately interfered with plaintiff's contractual relations with its existing customers, and deprived plaintiff of the pro-

and non-warranty) and (4) parts." Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 6. Later, however, plaintiff seems to state that these four components collectively comprise the relevant product market. *See id.* at 17 ("[S]ingle brand Navistar product markets in truck sales, parts and service in Central/Southern New Jersey is a relevant market...."). *See also id.* at 11 ("[T]he Complaint ... precisely defines the relevant product market to be Navistar new and used trucks, Navistar parts, and service for Navistar trucks.") (citing Complaint ¶ 37). Plaintiff then redefines the relevant product market yet again, by intimating that it is not simply NITC product, but rather NITC product as marketed with the "superior business skills" of Coast Cities. *See, e.g., id.* at 23 ("The most plausible explanation for Coast Cities' greater success is that through superior business skills Coast Cities transcended the normal marketing patterns, thereby creating a sepa-

rate market in Navistar trucks, which could not be penetrated by other brands, regardless of what might seem to the casual observer to be the otherwise interchangeable nature of those other trucks.").

5. Plaintiff has also characterized the relevant geographic market as "State of New Jersey, southern New York, eastern Pennsylvania, the State of Delaware and eastern Maryland." *See* Rosenberg Aff.Exh. K. Such a definition would be completely inconsistent with plaintiff's alternate definition of central and southern New Jersey, and with the well documented fact that it operated almost exclusively within its AOR, which consisted of Monmouth and Ocean Counties. For the reasons set forth *infra,* however, the Court need not determine the relevant geographic market.

spective economic advantages to be gained therefrom. *Id.* ¶¶ 45–50. This count further alleges that defendants conspired and acted to drive plaintiff out of business by: (1) allowing special bidding benefits to other Navistar dealers that were not provided to plaintiff in bidding for the business of General Engines and Sanitation Equipment; (2) instructing long-time Coast Cities customers, including Laidlaw and Consolidated Waste Company, to take their warranty repair work to "Navistar-invested dealerships"; (3) "[c]ausing plaintiff to finance its customers [sic] purchases of trucks with [NFC] and then refusing to do further business with plaintiff," thereby increasing plaintiff's limited liability penalty from 5% to 15%; (4) providing superior financing terms for plaintiff's customers, including Matthews Bus, for doing business with plaintiff's competitors, thereby preventing plaintiff from completing its contract with Matthews Bus; (5) refusing to issue bid and performance bonds to plaintiff, despite NFC's knowledge that plaintiff needed them and NFC's practice of providing such bonds to other dealerships under similar financial circumstances; (6) allowing Faulkner, Mid–Atlantic and Garden State to take repossessed vehicles to their own lots, thus allowing the dealerships to resell them before having to either pay the limited liability penalty or purchase the trucks · outright, without affording plaintiff the same opportunity; (7) prohibiting plaintiff from purchasing trucks repossessed from its customers, but then selling those trucks to other dealers for less money than plaintiff could have sold them to willing customers; and (8) dissuading prospective customers from purchasing trucks and parts from Coast Cities, by informing those prospective customers that Coast Cities would be out of business by August 10, 1992. *Id.* ¶¶ 48(a)–48(i). Count IV of the Complaint alleges that defendants breached their implied contractual duties of good faith and fair dealing. *Id.* ¶¶ 52–54. Count V claims that defendants failed to dispose of collateral securing debts guaranteed by plaintiff, in violation of N.J.S.A. 12A:9–504. *Id.* ¶¶ 56, 58. This count also complains that defendants refused to allow plaintiff to redeem collateral, and that defendants subsequently sold that collateral at a price less than the amount plaintiff tendered for redemption, in violation of N.J.S.A. 12A:9–506. *Id.* ¶¶ 57–58. Count VI of the Complaint alleges that defendant NITC's sale of trucks directly to consumers, most notably national fleet accounts in New Jersey, violates the New Jersey Franchise Practices Act, N.J.S.A. 56:10–1 *et seq. Id.* ¶¶ 60–65. Count VII asserts that defendants' acts interfered with plaintiff's contractual relations, were intended to drive plaintiff out of business, constitute unfair competition, and are "a violation of established business ethics and customs in the truck dealership business." *Id.* ¶¶ 65–68. Finally, Count VIII seeks punitive damages pursuant to the Clayton Act, 15 U.S.C. § 15, for defendants' alleged violations of the Sherman Act.

Defendants now seek summary judgment as to each of the above claims. Additionally, defendants NFC and Harco move for summary judgment on the counterclaims, which seek judgment in the amount of $127,890.31, which sum they allege represents the unpaid balance on the Open Account, against Thomas Gallagher and Dorothy Gallagher. Plaintiff seeks summary judgment on Count VI of the Second Amended Complaint, which alleges that NITC has violated the New Jersey Franchise Practices Act.

The Court has original jurisdiction over plaintiff's Sherman Act claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1 *et seq.,* and over its claim for punitive damages pursuant to the Clayton Act, 15 U.S.C. § 15. It has supplemental jurisdiction over the state common law and statutory claims pursuant to 28 U.S.C. § 1367. The Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiff is a corporation organized and existing under the laws of the State. of New Jersey, and maintains its principal place of business in Neptune, New Jersey. Second Amended Complaint ¶ 3. Defendant NITC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois. *Id.* ¶ 4. Defendant NFC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Rolling Mead-

ows, Illinois. *Id.* ¶ 5. Defendant Harco is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Rolling Meadows, Illinois. *Id.* ¶ 6.

## II. DISCUSSION

### A. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In a summary judgment motion, the nonmoving party receives the benefit of all reasonable doubts and any inferences drawn from the underlying facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the non-moving party bears the burden of proof at trial as to a dispositive issue, Rule 56(e) requires him to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). Issues of material fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Additionally, Rule 56(e) requires that "plaintiff ... must point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law." *Clark v. Modern Group Ltd.,* 9 F.3d 321, 326 (3d Cir.1993). There is, of course, no heightened standard for a plaintiff to survive a defendant's motion for summary judgment in the context of Sherman Act claims. *See Eastman Kodak Co. v. Image Technical Services Inc.,* 504 U.S. 451, 468–69, 112 S.Ct. 2072, 2082–83, 119 L.Ed.2d 265 (1992); *Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1195–97 (3d Cir.1995).

### B. COUNT I: SECTION 1 OF THE SHERMAN ACT

■ Section 1 of the Sherman Act provides in relevant part as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1 (West 1973). The Sherman Act targets activity that adversely affects competition, not competitors. *Brown Shoe Co. v. United States,* 370 U.S. 294, 329, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962). *See NCAA v. Board of Regents of University of Oklahoma,* 468 U.S. 85, 107, 104 S.Ct. 2948, 2963, 82 L.Ed.2d 70 (1984) (describing Sherman Act as a " 'consumer welfare prescription' ") (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979)); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 53 n. 21, 97 S.Ct. 2549, 2559 n. 21, 53 L.Ed.2d 568 (1977) ("[A]n antitrust policy divorced from market considerations would lack any objective benchmarks."). *See also J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1541 (3d Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (" '[T]he Supreme Court has recognized that the price discrimination that results where buyers seek competitive advantage from sellers encourages the aims of the Sherman Act ... while appellants point to injury to their particular business, they do not make the necessary showing of a substantially adverse effect on competition in the record market in general' to sustain a Sherman Act claim.") (quoting *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 887 (9th Cir.1982), *aff'd in part and rev'd in part,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983)).

■ There are four elements to a Sherman Act § 1 violation:

> (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse anti-competitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Tunis Bros. Co. v. Ford Motor Co.,* 763 F.2d 1482, 1489 (3d Cir.1985), *vacated,* 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 *on*

*remand,* 823 F.2d 49 (1987), *cert. denied,* 484 U.S. 1060, 108 S.Ct. 1013, 98 L.Ed.2d 979 (1988). *See also Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1364 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993) ("a plaintiff must prove 'concerted action,' a collective reference to the 'contract ... combination or conspiracy'") (quoting *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 445 (3d Cir. 1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978)).

### 1. The "Plurality of Actors" Requirement as to NITC, NFC and Harco

■ Defendants first contend that plaintiff's § 1 claim must fail because a corporation can not conspire with its wholly owned subsidiary to violate § 1 of the Sherman Act. Therefore, defendants conclude that NITC could not possibly conspire with NFC, its wholly owned subsidiary, or with Harco, the wholly owned subsidiary of NFC.

Defendants rely on the Supreme Court's decision in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) and the Third Circuit's decision in *Alvord–Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 999 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995). In *Copperweld,* the United States Supreme Court held that a corporation and its wholly owned subsidiary, as well as a corporation and an unincorporated division, must be viewed as a single entity for purposes of § 1 of the Sherman Act, and therefore can not conspire with each other.[6] *Copperweld Corp.,* 467 U.S. at 770–71, 104 S.Ct. at 2741–42. The Court noted that unlike concerted conduct among otherwise independent entities, which presents substantial anticompetitive risk and is therefore closely scrutinized by the Sherman Act, the internally coordinated conduct of a parent and its subsidiary presents no such risk because that conduct is basically as-

sumed by one actor pursuing the economic interests of a single firm. The Court stated as follows:

> Although this Court has not previously addressed the question, there can be little doubt that the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor.... A division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself.... Because coordination between a corporation and its division does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests, it is not an activity that warrants § 1 scrutiny.

*Id.*

■ The Court observed that the parent and its subsidiary "have a complete unity of interest[,]" including common objectives arising from the same corporate mission. *Id.* at 771, 104 S.Ct. at 2741. The Court further stated as follows:

> Indeed, the very notion of an "agreement" in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning. A § 1 agreement may be found when the "conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). But in reality a parent and a wholly owned subsidiary always have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

*Id.* at 771–72, 104 S.Ct. at 2742. Therefore, to establish a violation of § 1 of the Sherman Act, plaintiff must provide evidence that two or more distinct entities conspired or com-

---

6. The *Copperweld* Court expressly declined to consider whether "a parent may be liable for conspiring with an affiliated corporation it does not own." *Copperweld Corp.,* 467 U.S. at 767, 104 S.Ct. at 2739. The Third Circuit refused to consider the issue in *Tunis Bros. Co. v. Ford*

*Motor Co.,* 952 F.2d 715, 728 (3d Cir.1991), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992), but considered it in *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125 (3d Cir.1995). *See infra* pages 18–23 and note 6.

bined to take anticompetitive action against it. *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1131 (3d Cir.1995) (citing *Weiss v. York Hospital,* 745 F.2d 786, 813 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985)).

This standard compels the Court to dismiss plaintiff's § 1 conspiracy claims against defendants. The defendants to this action are NITC, NFC and Harco. It is undisputed that Harco is a wholly owned subsidiary of NFC, which is a wholly owned subsidiary of NITC. Pursuant to the express mandate of *Copperweld,* the intra-corporate conspiracy doctrine can not apply to render these entities liable for conspiracy to violate § 1 of the Sherman Act. *See also Alvord–Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 999 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995).

■ Plaintiff asserts in opposition that it did not intend to limit Count I to the named defendants, but that Count I is most properly read to include the dealcors. Plaintiff states as follows:

> The Defendants simply misread the Complaint in reaching the conclusion that the alleged conspiracy involves only the three Defendant affiliates. Since manufacturers are prohibited under New Jersey law from selling directly to customers, it was necessary for Navistar to effectuate the creation of the Dealcors to assist it in carrying out its scheme. Therefore, the Complaint alleges that (1) the Defendants *and (2) the two Dealcors and (3) the two independent principals/operators* of the Dealcors conspired to accomplish their unlawful scheme of driving Coast Cities out of business.

Plaintiff's Brief in Opposition to Defendant NITC's Motion for Summary Judgment at 34 (citing Second Amended Complaint ¶ 24) (emphasis in original).

The pitfalls inherent in this reasoning are legion. Most significant, however, is that the Second Amended Complaint neither pleads the dealcors as defendants, nor alleges that they conspired with defendants to violate the Sherman Act. The single provision of the Second Amended Complaint upon which plaintiff relies states as follows:

> Commencing sometime in 1980, the exact date being unknown to plaintiff Coast Cities, Navistar, in combination and conspiracy with all of the other defendants, began a campaign to monopolize the market for the retail sale of Navistar trucks, truck parts and repair services for Navistar trucks in the relevant geographic market.

Second Amended Complaint ¶ 24. Within Count I itself, plaintiff pleads as follows:

> Navistar's campaign to monopolize the market for the retail sale of Navistar trucks and truck parts and repair services for Navistar trucks, and the knowing participation of Navistar's co-defendants in the campaign of consolidation, are a conspiracy of consolidation, are a conspiracy and combination of in restraint of trade producing adverse anti-competitive effects within the relevant market in violation of Section 1 of the Sherman Anti-trust Act.

*Id.* ¶ 37. Similar provisions impugning the conduct of NITC and its co-defendants, but not that of the dealcors or other dealerships, appear throughout the Second Amended Complaint. *See, e.g., id.* ¶ 23 ("Commencing sometime in 1980 ... Navistar, in combination and conspiracy with all other defendants, began a campaign to restrain trade in the markets for the retail sale of Navistar trucks, truck parts and repair services...."); *id.* ¶ 25 ("Navistar has attempted to drive Coast Cities and other privately-financed [sic] independent dealerships out of business by discriminating against them....").

While plaintiff correctly asserts that the non-moving party is entitled to the benefit of all reasonable doubts and any inferences drawn from the underlying facts, its chameleon-like, eleventh-hour reinterpretation of its third version of the Complaint does not create a factual issue, and can not resuscitate an inadequately pleaded claim equally subject to dismissal pursuant to FED.R.CIV.P. 12(b)(6). The Complaint, viewed in any of its three versions, is wholly bereft of any allegation that the dealcors were actors in the alleged § 1 conspiracy, but instead repeatedly pleads that the conspiracy was solely among the co-defendants.

## 2. *Application of* Copperweld *to NITC and the Dealcors*

■ Moreover, even if the Second Amended Complaint had properly pleaded the dealcors as participants in the conspiracy, there is substantial precedent for the conclusion that they still could not have conspired with defendants. Although the Court in *Copperweld* limited its holding to parents and wholly owned subsidiaries, it instructed courts to examine the substance, rather than the form, of economic arrangements to determine the possibility for an intra-corporate conspiracy. *Copperweld,* 467 U.S. at 772–73, 104 S.Ct. at 2742–43. Since that decision, several courts have concluded that subsidiaries that are not wholly owned nevertheless can not be actors in conspiracy with their majority owners. *See, e.g., Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1132–34 (3d Cir.1995); *Williams v. I.B. Fischer Nevada,* 999 F.2d 445, 447 (9th Cir. 1993) ("To be capable of conspiring, corporate entities must be 'sufficiently independent of each other.' Whether corporate entities are sufficiently independent requires an examination of the particular facts of each case.... The evidence cited by the district court clearly demonstrates that [the franchisor and franchisee] comprise a 'common enterprise.' ") (citations omitted); *Bell Atlantic Business Systems Services v. Hitachi Data Systems Corp.,* 849 F.Supp. 702, 706 (N.D.Cal.1994) (parent corporation can not conspire with subsidiary of which it owned 80%); *Novatel Communications, Inc. v. Cellular Tele. Supply, Inc.,* No. C85-2674A, 1986 WL 15507 (N.D.Ga. Dec. 23, 1986) (parent corporation and subsidiary, of which parent owned 51%, could not conspire, as the "51% ownership retained by [the parent] assured it of full control over [the subsidiary] and assured it could intervene at any time that [the subsidiary] ceased to act in its best interests").

The Third Circuit's recent decision in *Siegel Transfer, Inc.* is instructive. In that case, plaintiffs were a motor contract carrier and companies leasing trucks and drivers to carriers. They alleged several separate conspiracies, including: (1) among Bethlehem Steel and its subsidiary, the Philadelphia Bethlehem and New England Railroad, of which Bethlehem Steel owned 99.92%; and (2) among Carrier Express, also a motor carrier, Carrier Express's agents, and Oak Management Inc., which managed the operations of Carrier Express and other motor carriers. *Siegel Transfer, Inc.,* 54 F.3d at 1133–35. Heeding *Copperweld* 's directive to examine the substance of the arrangement to determine whether there is unity of purpose or concerted action, the Third Circuit first held that the "plurality of actors" element of § 1 was not satisfied. The Third Circuit found that "[a]lthough Bethlehem Steel did not own .08% of the Railroad's stock, the difference between its 99.92% ownership and the 100% ownership in *Copperweld* is de minimus." *Id.* at 1133. The Third Circuit concluded that by owning 8993 of the subsidiary's 9000 outstanding shares of stock, Bethlehem Steel maintained complete control over the Railroad. *Id.*

More relevant for purposes of this matter is the Third Circuit's conclusion that plaintiff failed to satisfy the plurality element as to the alleged conspiracy among Carrier Express, its agents and Oak Management. *See id.* at 1135.[7] As to Carrier Express and its agents, the court found that the agents, "whose only function was to make arrangements for the transport of Carrier Freight with authorized carriers, did not compete with Carrier Express. As the conduit between Carrier Express and those with trucking equipment and drivers, the agents were an essential part of Carrier Express operations." *Id.* Further, the court determined

---

7. The Third Circuit compared its case with *Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313 (8th Cir.1986), wherein the Eighth Circuit held that certain corporate agents can not conspire with the parent or principal where their relationship serves uniform economic interests. In *Pink Supply,* a former dealer of office furniture manufactured by defendant Hiebert alleged that Hiebert and four of its sales representatives violated § 1

of the Sherman Act by engaging in price-fixing and a boycott conspiracy. The sales representatives were commissioned agents who promoted the Hiebert product line to prospective customers. The sales agents neither set prices nor arranged sales terms. The Eighth Circuit therefore found that the sales agents were employees with unified corporate interests. *Id.* at 1316.

that the economic interests of the agents and the parent were linked, because the agents received a commission from Carrier Express based on the loads they arranged for Carrier Express to transport. *Id.*

· The Third Circuit reached a similar conclusion after scrutinizing Carrier Express's relationship with Oak Management. The court first observed that Oak Management had formally agreed to manage Carrier Express's daily operations, which conferred upon the former a contractual duty to safeguard and promote Carrier Express's economic interests. *Id.* Moreover, the court found that because Oak Management's fee was a percentage of Carrier Express's revenue, Oak Management's financial success was directly tied to that of Carrier Express. *Id.* "Hence, Carrier Express and Oak Management constituted one economic unit[,]" and could not conspire with each other under § 1. *Id.*

■■■ *Copperweld* and *Siegel Transfer* thus teach that § 1 of the Sherman Act focuses on concerted activity among otherwise independent actors. Courts examining the substance, rather than the form of the economic arrangement, may initially engage in a bright-line analysis of whether a subsidiary is wholly owned. However, if the subsidiary is not wholly owned, the court's inquiry does not end there. Instead, a court must next determine whether the parent and subsidiary are inextricably intertwined in the same corporate mission, are bound by the same interests which are affected by the same occurrences, and exist to accomplish essentially the same objectives. For example, a parent that does not wholly own a subsidiary but nevertheless asserts total dominion over its actions, by way of management control, contractual obligations, economic incentives, or otherwise, is probably incapable of conspiring with that subsidiary for purposes of § 1 of the Sherman Act. *Williams,* 999 F.2d at 447.

In this case, it is evident that NITC maintained nearly complete control over the two relevant dealcors, Mid Atlantic and Faulkner, and that those dealcors' success was inextricably linked to that of NITC. First, NITC has owned all of the voting shares of Mid Atlantic since its inception in 1991. *See* Krzysiak Aff. ¶ 26. NITC also owned all of the voting shares of Faulkner from its inception until July, 1991, when it owned 70% of the voting shares of Faulkner/Freedom, which changed in 1994, when NITC resumed total 100% ownership of the voting shares. *Id.* ¶¶ 23–24. Hence, by definition, NITC has owned at all relevant times enough of the voting shares in each dealcor to dictate the objectives and actions of each dealcor. Of course, NITC also has a substantial interest in the success of each dealcor, insofar as NITC incurs nearly all of the risks and start-up costs in creating a dealcor. *See supra* page 6. For example, since 1991, it has invested approximately $2.8 million in Mid Atlantic. Krzysiak Aff. ¶ 27.

That NITC and the dealcors have unified economic objectives and the same corporate purpose is manifest. As in *Siegel Transfer,* NITC's interests and those of the dealcors are closely knit and mutually dependent. NITC creates dealcors to serve its own purpose of either expanding the distribution of International product into potentially lucrative geographic areas, or of retaining a dealership in a particular area. *See supra* page 6 (citing Krzysiak Aff. ¶ 13). Therefore, NITC relies on the dealcors, as well as the dealerships, to promote its own market presence against stiff competition from Ford, GMC and other manufacturers and assemblers.

On the other hand, a dealcor president presumably buys into the dealership with the expectation that it will succeed and that he will ultimately buy out NITC's shares. Whether he actually does so is contingent on the dealcor's performance, and the bonus allocated him by NITC. *See supra* page 6. Clearly, then, the economic objectives of NITC and the dealcors are nearly identical, and vary only to the extent that NITC's focus is national, while a dealcor's presumably is more regional.

Some modicum of independence might be found in the dealcor president's duty of running its daily operations. However, the dealcor itself is administered by a three-person board of directors, of which the dealcor president is a member. The board reports to NITC's Vice President for Dealer Opera-

tions, who reports to NITC's Group Vice President for Sales and Distribution. Krzysiak Aff. ¶ 14. This corporate governance structure, coupled with NITC's retention of all or, at times, most, voting shares, makes it difficult to discern in this chain of command such independence as to materially distinguish the case *sub judice* from the facts of *Siegel Transfer* or *Pink Supply*.[8] It follows that these shared objectives, as well the restrictive administrative control that NITC exercises over the dealcors, simply do not allow for the concerted, anti-competitive action contemplated by § 1 of the Sherman Act.

Accordingly, the Court concludes that defendants and the dealcors lacked the capacity to conspire with defendants in violation of § 1 of the Sherman Act.

### 3. *The Relevant Product Market*

■ The Court also must dismiss Count I in the absence of a relevant product market within which the alleged antitrust conspiracy or conduct could have occurred. At the outset of this section, the Court rejects plaintiff's suggestion that a genuine issue of material fact exists if plaintiff and defendant are unable to agree on a relevant product or geographic market, or if plaintiff is unable to define the parameters of the market. *See* Plaintiff's Brief in Opposition at 12. This proposition overemphasizes earlier courts' reluctance to grant summary judgment in complex antitrust cases, and is a misreading of the Rule 56 standard in the wake of *Matsushita* and *Celotex*. *See, e.g., Town Sound and Custom Tops v. Chrysler Motors,* 959 F.2d 468, 481 (3d Cir.1992), *cert. denied,* 506 U.S. 868, 113 S.Ct. 196, 121 L.Ed.2d 139 (1992) ("The plaintiffs nonetheless contend

that the definition of the tying product market and the existence of market power therein are issues of fact that we should not weigh and should leave to the jury to decide. The question of market power is certainly dependent on factual findings, and some older cases did state that summary judgments against plaintiffs are particularly disfavored in complex antitrust cases.... But many courts, including the Supreme Court, have more recently held defendants entitled to summary judgment in antitrust cases.... It may be that because antitrust cases are so factually intensive that summary judgment occurs proportionally less frequently there than in other types of litigation, but the standard of F.R.C.P. remains the same."). In any event, the Court concludes that there is no genuine factual issue as to the relevant product market. As explained *infra*, the relevant product market, for purposes of this motion, consists of medium- and heavy-duty trucks, parts and warranty services.

■ . Defining the market for purposes of antitrust claims requires defining the relevant product market and then the relevant geographic market. To determine the relevant product market, the Court must examine which commodities are "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956); *Fineman v. Armstrong World Indus.,* 980 F.2d 171, 189 (3d Cir.1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). Defining the relevant product market calls into consideration factors such as price, use and qualities. *Tunis Bros. Co.,* 952 F.2d at 722 (citing *E.I. duPont de Nemours & Co.,* 351 U.S. at 404, 76

---

**8.** Plaintiff recognizes as much in the Second Amended Complaint. Plaintiff states as follows:

A "dealcor" is a dealership established with capital from Navistar. Although not subsidiaries of Navistar, all dealcors are required to transfer a controlling share of their outstanding stock to Navistar when the dealcors are established in consideration of the capital Navistar provides to the dealcors. The customary agreement between Navistar's [sic] and its dealcors provides that the dealcors have the right to repurchase their stock from Navistar out of the profits of the dealership.... [T]he

majority of the officers and directors of the dealcors are Navistar employees who have virtually complete control over the operation of the dealcors. Therefore, Navistar remains in *de facto* control of its dealcors.

....

Faulkner, Garden State and Mid–Atlantic are also dealcors as those entities have been described in this complaint. They are under the *de facto* control of Navistar, which owns a majority of the shares of their outstanding stock....

Second Amended Complaint ¶¶ 16, 18.

S.Ct. at 1012). "Accordingly, the products in a relevant market product would be characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Id.* at 722. *See also E.I. duPont de Nemours & Co.,* 351 U.S. at 395, 76 S.Ct. at 1007 ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce' monopolization of which may be illegal."); *Fineman,* 980 F.2d at 198–99 (quoting *Tunis Bros. Co.,* 952 F.2d at 722). Additionally, submarkets may exist within the general product market. *See, e.g., Brown Shoe Co.,* 370 U.S. at 325, 82 S.Ct. at 1524 (Submarket may exist where "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.").

■ It is plaintiff's burden to define the market. *See Pastore v. Bell Telephone Co. of Pennsylvania,* 24 F.3d 508, 512 (3d Cir.1994); *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 726 (3d Cir.1991), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). In this case, plaintiff offers three inconsistent explanations of the relevant product market. *See supra* note 4. First, it asserts that a separate individual product market exists for each of the following: (1) new International trucks; (2) used International trucks; (3) warranty and non-warranty service of International trucks; and (4) International parts. Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 6. Second, plaintiff insists that these four components collectively comprise the relevant product market. *See id.* at 17. *See also id.* at 11 (citing Second Amended Complaint ¶ 37). In this version of the relevant product market, plaintiff maintains that NITC products constitute their own market. Finally, plaintiff maintains that the relevant product market is NITC products as marketed with the "supe-rior business skills" of Coast Cities. *See, e.g., id.* at 23.

■ First, for purposes of this motion, there is no reason to treat new International trucks as a product market distinct from parts or warranty service. The allegations underlying plaintiff's claims certainly treat new trucks, parts and warranty service as one market, insofar as the Second Amended Complaint does not plead distinct instances of Sherman Act violations as to parts sales and distribution. Moreover, NITC dealers are authorized to sell new trucks and parts, and to offer warranty services. Indeed, the parties agree that NITC warranty services are not a separate market from its trucks and parts, because customers generally base their purchase choices of trucks on the "whole package," including the truck itself, the comparative features and costs attendant to the truck, the warranty service package offered with it, and the location of the dealer. Douglas Gallagher, founder of the Coast Cities dealership, testified as follows:

Q. Now, based upon your experience in the business, what typically did the customer look for when that customer came to you for a truck?

A. He was buying from the dealer.

Q. Which means what?

A. [A]s Navistar calls it, value-added.

Q. Meaning what?

A. They wanted the whole package, they wanted to be able to get parts service and they wanted to be able to talk to somebody.

Q. Were they interested in the quality of the vehicle that they were buying?

A. That was not number one.

Q. What was number one?

A. The dealer.

Q. What was number two?

A. Quality.

Q. What was number three?

A. Probably parts availability.

. . . .

Q. Did there come a point when a customer would make a decision based on

price as opposed to numbers one through four?

A. Yes, yes. The customer that didn't buy a truck all the time did price and the customer that bought trucks a lot—

Q. Sold the fleets?

A. Right. The ones in the middle, they would suggest price for—maybe for locale.

Q. And the ones in the middle, was there ever a time when price became the predominant?

A. Yes.

Rosenberg Aff.Exh. B, at 415–4 to 415–22; 416–4 to 416–15. *See also* Defendant NITC's Rule 12(G) Statement of Material Facts As To Which There Is No Genuine Dispute ¶ 104.

■ Second, there is no basis in the record to support plaintiff's depiction of the relevant product market as International products coupled with plaintiff's own marketing acumen. Plaintiff offers nothing to demonstrate how its entrepreneurial skills conferred a unique benefit upon consumers not provided by other International dealers. There is no suggestion that Coast Cities' prices were significantly lower, that it offered a wider selection of trucks or parts, or that its warranty service was more efficient or responsive to consumers' needs. In fact, the record is clear that at several points plaintiff could not match the parts or services of other authorized International dealers, because Coast Cities was on C.O.D. status. *See* Bradley Aff. ¶ 11; Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 8. Therefore, the Court must conclude that plaintiff's salesmanship is irrelevant to the scope of the Court's inquiry, *i.e.*, whether the conduct of NITC and the co-defendants presented a realistic risk of anti-competitive harm to the consumer. Plain-

tiff's characterization of the relevant market as NITC product combined with its own marketing strategy would channel the pertinent inquiry away from the potential harm to the consumer, to the harm faced by the dealer.

■ Similarly, the Court rejects plaintiff's contention that International trucks, parts and service constitute their own product market.[9] Under limited circumstances, a single brand of product may constitute the entire relevant product market. *See, e.g., Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Tarrant Service Agency v. American Standard, Inc.,* 12 F.3d 609, 614–15 (6th Cir.1993), *cert. denied,* ―― U.S. ――, 114 S.Ct. 2709, 129 L.Ed.2d 836 (1994). The plaintiffs in *Kodak* were independent service organizations ("ISOs") that serviced and Kodak equipment and parts. *Id.* at 455, 112 S.Ct. at 2076. Certain types of Kodak equipment, such as its photocopier and micrographic devices, are unique, and their component parts are not compatible with equipment by other manufacturers. *Id.* at 456–57, 112 S.Ct. at 2076–77. In addition to the ISOs, Kodak customers could obtain service and parts from Kodak itself, although the price was substantially higher. *Id.* at 457, 112 S.Ct. at 2077. Kodak then adopted certain policies that restricted the sale of replacement parts for its photocopier and micrographic equipment to "buyers of Kodak equipment who use Kodak service or repair their own machines," effectively precluding ISOs from obtaining replacement parts. *Id.* at 458, 112 S.Ct. at 2077. Consequently, many ISOs were forced out of business, while still more lost significant revenue, as customers were forced to switch to Kodak service even though many preferred ISO service. *Id.*

9. Moreover, it is clear that International parts are neither exclusive nor obtainable only from NITC. Although NITC manufactures some of its own parts, most of the assembly parts are produced by a wide array of component manufacturers pursuant to non-exclusive licenses. Koch Aff. ¶ 3. Plaintiff does not dispute that these manufacturers, as well as authorized International dealerships and dealcors, sell the parts themselves to other distributors, thereby creating a substantial aftermarket for parts compatible with International vehicles. *Id.* ¶¶ 3–5. Given

the parts aftermarket and the component parts manufacturers' participation in it, NITC must compete with those manufacturers and distributors, and International dealers must similarly compete with independent garages, retailers and other brand dealers who also sell parts. *Id.* ¶¶ 6–7. In a market with sales ranging from approximately $6.6 billion to $7.4 billion through 1993, NITC's share has ranged from 6–8%. *Id.* ¶ 7. Accordingly, the Court finds that International parts do not, by themselves, constitute a relevant product market.

The ISOs brought an antitrust action alleging that Kodak violated § 1 of the Sherman Act by illegally tying together its parts and service, and that Kodak violated § 2 by illegally monopolizing and attempting to monopolize Kodak parts. Kodak responded that it could not have violated § 2 because a single brand of product can never constitute the relevant market. The Supreme Court rejected this proposition, stating as follows:

> Kodak also contends that, as a matter of law, a single brand of product or service can never be a relevant market under the Sherman Act. We disagree. The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners.... Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak-equipment owner's perspective is composed of only those companies that service Kodak machines.... This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market.

*Id.* at 481, 112 S.Ct. at 2090. (citations omitted).

 The *Kodak* Court noted that, as in any analysis of the relevant product market, the proper consideration is the commercial reality faced by consumers. *See also United States v. Grinnell Corp.*, 384 U.S. 563, 572, 86 S.Ct. 1698, 1704–05, 16 L.Ed.2d 778 (1966). Accordingly, a single brand of product can, by itself, constitute a relevant product market when that product is unique and no reasonable substitutes exist for the consumer. *Id.* See also *Tarrant Service Agency, Inc. v. American Standard, Inc.*, 12 F.3d 609, 614 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2709, 129 L.Ed.2d 836 (1994); *Town Sound and Custom Tops, Inc.*, 959 F.2d at 480 (refusing to find that Chrysler cars, by themselves, comprised product market where there was evidence of significant cross-price elasticity of demand with other cars). Thus, if other manufacturers either actually or conceivably could take business away from NITC, then International products can not, by themselves, constitute

the relevant product market. *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978).

In this case, the record is clear that International products and repair services are neither unique nor without reasonable substitutes. As plaintiff's own president, Douglas Gallagher recognizes, NITC can and has lost prospective buyers to other manufacturers. *See* Rosenberg Aff.Exh. B at 416–13 to 416–24 (stating that Coast Cities sometimes lost customers to Ford if price of International truck was too high). Defendants also offer evidence of cross-price elasticity between International trucks and other manufacturers' trucks. *See* Krzysiak Aff. ¶¶ 8, 33. The trucks are put to the same uses, in a general sense, with sales depending on the trucks' comparative prices and features, and the services and location of the dealers. *See id.* Therefore, NITC's prices are constrained by those of the competition, and there is substantial cross-price elasticity between International trucks and those of other manufacturers.

 Of course, it may be that International trucks offer some features that other trucks do not, or they may be considered generally superior trucks. However, plaintiff offers no such evidence. Moreover, such recognition does not give rise to a single product market, because it does not mean that International trucks are not reasonably interchangeable with other trucks or, in other words, that consumers would not forego the additional International feature for a better price or alternate feature that is part of another manufacturer's truck.

In *Town Sound and Custom Tops, Inc.*, 959 F.2d 468 (3d Cir.1992), the Third Circuit considered and rejected the proposition that Chrysler automobiles competed in their own market, noting that "GM, Ford, Toyota, Honda, and other auto manufacturers are perfectly capable of producing functionally similar and competitive products." *Id.* at 480. In that case, the court noted that prospective purchasers of Chrysler automobiles compared price, quality and features with other automobile brands. *Id.* As in *Town Sound,* the defendants in this case offer unrebutted

testimony that International trucks compete vigorously with Ford, GMC, Paccar (manufacturer of Peterbilt and Kenworth brands) and Freightliner for a share of the nationwide market.[10] *See supra* page 5. *See also* Krzysiak Aff. ¶¶ 5–8. Douglas Gallagher's own testimony reveals that prospective buyers compare the quality and prices of different brands before purchasing a truck, and that NITC's and its dealers' pricing are constrained by the prices that competitors charge for similar trucks. *See supra* pages 24–25, 27 (citing Gallagher deposition, attached as Exh. B to Rosenberg Aff.). There is simply nothing on the record before the Court to indicate that there is no reasonable interchangeability of International trucks with those of other manufacturers.

Accordingly, the Court concludes that plaintiff has failed to establish a relevant product market in which defendants allegedly conspired to engage in anti-competitive conduct prohibited by § 1 of the Sherman Act. Moreover, plaintiff has not offered evidence that defendants engaged, or conspired to engage, in anti-competitive conduct within the actual product market. For these reasons, as well as those discussed *supra* at II(B)(1) and II(B)(2) of this Memorandum Opinion, plaintiff's § 1 claim must be dismissed.

## C. COUNT II: SECTION 2 OF THE SHERMAN ACT

Section 2 of the Sherman Act provides in pertinent part as follows: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C.A. § 2 (West 1973).

■■■■ To establish its monopoly claim under § 2 of the Sherman Act, plaintiff must demonstrate both that NITC possesses monopoly power within the relevant market and that it has willfully acquired that power for monopolization or anti-competitive purposes, rather than growth from its superior products, business acumen or historical accident. *Grinnell Corp.*, 384 U.S. at 570–71, 86 S.Ct. at 1703–04; *Fineman*, 980 F.2d at 197. To succeed on its claim of attempted monopolization claim under § 2, Coast Cities must show that NITC possessed both the specific intent to monopolize the product market and sufficient market power to create a dangerous probability of success. *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1079 (3d Cir.1978). *See also American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).[11]

■■■■ In this case, plaintiff can not show monopolization power within the relevant product market. As stated previously, the relevant product market is neither NITC product nor NITC product marketed with the superior business acumen of Coast Cities, but instead includes other manufacturers and assemblers of medium- and heavy-duty

---

**10.** Plaintiff seems to suggest that because marketing for automobiles differs from marketing of trucks, the Court should infer that it is more possible for a particular brand of truck to constitute a relevant product market. *See* Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 20–22. Relying almost exclusively on the affidavit of Douglas Gallagher, plaintiff asserts that automobiles are marketed through mass media and often by the manufacturers rather than the dealers, therefore making it less likely that a particular brand of car, by itself, will constitute a relevant product market. *Id.* Plaintiff then reasons that, by contrast, a particular brand of truck is more likely to comprise a product market because dealers sponsor the advertising campaigns and often offer only one particular brand of truck. *Id.*

There are two problems with plaintiff's argument. First, it has offered nothing to support its depiction of the automobile and truck markets. Plaintiff relies solely on the testimony of Douglas Gallagher, whose knowledge of the automobile market is unestablished, as is his knowledge of the practices of other truck dealers. Second, and more importantly, even if plaintiff's characterizations of the automobile and truck markets and their marketing campaigns is accurate, they are largely irrelevant. Although a truck dealer may offer only one brand, and generate its own advertising, there is still a reasonable cross-price elasticity between International and other truck brands, such that an increase in the price of an International truck may cause consumers to opt for another manufacturer's brand and, by plaintiff's own reasoning, probably another dealer.

**11.** The Court will dismiss plaintiff's § 2 conspiracy claim in light of the conclusions reached in section II(B) of this Memorandum Opinion. *See supra* pages 15–23.

trucks. Plaintiff has made no demonstration that within this market NITC possesses monopoly power, or that it possesses sufficient market power to present a dangerous probability of success. There is no allegation that within this market, NITC has the power "to control prices or exclude competition," or that it has a predominant share of the market. *See E.I. duPont de Nemours,* 351 U.S. at 391, 76 S.Ct. at 1005 (providing similar formula to detect monopoly power); *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of PA,* 745 F.2d 248, 260 (3d Cir.1984) ("the size of the market is a primary determinant of whether monopoly power exists"), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). While NITC enjoys a greater share of the market that its competitors, that share has not exceeded 29.9%, and more often seems to remain around 27%. *See* Krzysiak Aff. ¶ 6. Moreover, its market share has declined slightly over the last two to three years, as companies such as Paccar and Freightliner improved their own shares. *Id. Cf. Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 489 (5th Cir.1984) (invoking Judge Learned Hand's formulation that 90% is enough, 60% is not likely to suffice, and 33% is insufficient, to constitute monopoly power); *Fineman,* 980 F.2d at 200 ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power.... A significantly larger market share than 55 percent has been required to demonstrate prima facie monopoly power.") (citations omitted).

Similarly, the above discussion clearly reveals that NITC can not, by itself, control prices or consumer access to medium- and heavy-duty trucks. Plaintiff does not dispute that NITC's prices are constrained by the comparative prices and features offered by its competitors. *See Weiss v. York Hospital,* 745 F.2d 786, 827 n. 72 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985) (other factors relevant to determining monopoly power include "the size and strength of competing firms, freedom of entry into the field, pricing trends and practices in the industry, ability of consumers to substitute comparable goods [or] services from outside the market, and con-

sumer demand factors. A defendant's power either by itself or aided by these other factors must be enough to restrict entry, supply, or price.") (citing L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST §§ 22–32 (1977)). The testimony referenced above reveals that Douglas Gallagher and defendants recognize that prospective purchasers of trucks will consider proximity of the dealership to their location, price, features and warranty service, and that any manufacturer must remain competitive in these areas to retain its market share. Accordingly, the Court can not find the existence of monopoly power, or sufficient market power to create a dangerous probability of success. This conclusion obviously applies as well to NITC's share of the parts market. *See supra* note 9. Therefore, the Court will dismiss Count II of the Complaint.

### D. COUNT III: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND WITH PROSPECTIVE ECONOMIC ADVANTAGES

In Count III, Coast Cities asserts that defendants impeded its contractual relations with existing customers to put plaintiff out of business, thereby eliminating it as a competitor with Faulkner, Garden State and Mid Atlantic. Plaintiff alleges that defendants committed at least eight instances of tortious interference with its contractual relations and prospective economic advantages. *See supra* page 11.

 Pursuant to New Jersey law, a plaintiff must establish five elements to prevail on a claim for tortious interference with prospective contractual relations and economic advantages: (1) that plaintiff had a reasonable expectation of an economic benefit or advantage; (2) that defendant knew of plaintiff's expectancy; (3) that defendant wrongfully and intentionally interfered with this expectancy; (4) a reasonable probability that but for defendant's wrongful interference, plaintiff would have realized the economic benefit; and (5) that plaintiff was injured as a result of defendant's conduct. *Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 751–52, 563 A.2d 31 (1989); *Fineman,* 980 F.2d at 186.

■ The gravamen of a claim for tortious interference is that the defendant's conduct was wrongful, *Brounstein v. American Cat Fanciers Ass'n,* 839 F.Supp. 1100, 1112 (D.N.J.1993), thus requiring plaintiff to establish that defendant acted with malice. *Printing Mart–Morristown,* 116 N.J. at 751, 563 A.2d 31; *Louis Kamm, Inc. v. Flink,* 113 N.J.L. 582, 588, 175 A. 62 (E. & A. 1934). Malice is the "intentional doing of a wrongful act without justification or excuse." *Louis Schlesinger Co. v. Rice,* 4 N.J. 169, 181, 72 A.2d 197 (1950). Additionally, an action for tortious interference with a prospective contractual relation can not be sustained " 'where the claim is by one party against the other party to the contract and not against a third party interloper who has interfered with the contractual relationship.' " *Fregara v. Jet Aviation Business Jets,* 764 F.Supp. 940, 955 (D.N.J.1991) (quoting *Sandler v. Lawn–A–Mat Chemical & Equipment Corp.,* 141 N.J.Super. 437, 450, 358 A.2d 805 (App. Div.), *certif. denied,* 71 N.J. 503, 366 A.2d 658 (1976)).

■ For reasons explained *infra,* it appears that Count III also may allege instances of interference with performance of existing contracts. "The separate cause of action for the intentional interference with a prospective contractual or economic relationship has long been recognized as distinct from the tort of interference with the performance of a contract." *Printing Mart–Morristown,* 116 N.J. at 750, 563 A.2d 31 (citing *Harris v. Perl,* 41 N.J. 455, 197 A.2d 359 (1964); *C.B. Snyder Realty Co. v. Nat'l Newark & Essex Banking Co.,* 14 N.J. 146, 101 A.2d 544 (1953); *Van Horn v. Van Horn,* 52 N.J.L. 284, 20 A. 485 (Sup.Ct.1890)). However, the difference between tortious interference with prospective contractual relations and tortious interference with performance of a contract is simply the existence of a contract, as opposed to plaintiff's reasonable expectation of an agreement. *See Printing Mart–Morristown,* 116 N.J. at 750–51, 563 A.2d 31.

■ The Court will now examine the alleged instances seriatim. The first claim alleges interference with two existing contractual relations. *See* Second Amended Complaint ¶ 48(b); Gallagher Certif. ¶¶ 46–49. The Second Amended Complaint alleges[12] that Laidlaw and Consolidated were long-time customers of Coast Cities' repair facilities, until NITC instructed them to seek repair services from other dealerships. Gallagher Certif. ¶¶ 47–48. Plaintiff further alleges that "Navistar's sole purpose in so instructing Laidlaw and Consolidated Waste Company was to deprive Coast Cities of the business of these companies so as to weaken Coast Cities's ability to compete in the market for the retail sale of trucks and truck repair services." *Id.* ¶ 49.

NITC contacted Laidlaw and Consolidated after Coast Cities was placed on C.O.D. status in February, 1991, for failure to pay the Open Account, the balance of which was $218,448.75, and because two checks totalling $80,000.00 had been returned for insufficient funds. In fact, Coast Cities had not made a payment on the Open Account for more than three months. *See supra* pages 3–4. *See also* Gallagher Deposition at 301–23 to 301–24 (explaining that NITC placed Coast Cities on C.O.D. status "[b]ecause we owed them money"), attached as Exh. B to Rosenberg Aff.; Bradley Aff.Exh. C. Coast Cities does not deny that, pursuant to the Dealer Agreement, it was NITC's contractual right to place plaintiff on C.O.D. status, nor that NITC could have even terminated the Dealer Agreement because of the unpaid balance. *See supra* pages 2–3 (quoting Dealer Agreement at 16, attached as Exh. C to Smith Certif.).

NITC therefore contends that it contacted Laidlaw and Consolidated because Coast Cities was unable to perform repair service after being placed on C.O.D. status. NITC states that it notified the two customers of Coast Cities' position because NITC has a legitimate business interest in providing adequate warranty repair facilities for its customers, thereby keeping them satisfied with

---

**12.** Actually, the Second Amended Complaint does not allege anything regarding Laidlaw Transit or Consolidated Waste Company; nor does it reference them by name. Instead, the Certification of Douglas Gallagher, which is only supposed to attest to facts within his personal knowledge, articulates the claims that should have been set forth in the pleadings.

NITC products and repair services. The Court agrees, and therefore concludes that there is no genuine factual issue that NITC's conduct was neither malicious nor wrongful.

Coast Cities was, by its own admission, unable to perform any significant amount of warranty repair work because it could not obtain parts in a reasonably expeditious manner. *See* Gallagher Dep. at 302–16 to 302–19, attached as Exh. B to Rosenberg Aff. ("The minute we were placed on COD, we couldn't supply parts and the customers know that Mid Atlantic existed in Linden, so they went there to get their warranty work performed."). In turn, NITC had a reasonable interest, if not a contractual duty, to inform its customers of other sources of warranty repair work. Accordingly, Coast Cities' claim that NITC acted without justification or excuse, and hence with malice, is meritless.

■ The second alleged instance of tortious interference apparently involves prospective contractual relations. *See* Second Amended Complaint ¶ 48(a). Plaintiff alleges that NITC provided SPA only to certain authorized International dealers and customers, and thereby interfered with Coast Cities' ability to pursue prospective contractual relations. The pleading of this claim, and plaintiff's papers in opposition to defendants' motions for summary judgment, do not articulate the specific instances in which this allegedly occurred. Although plaintiff alleges that NITC and NFC frequently provided SPAs only to certain dealerships, only one alleged instance can be deduced from the record. *See* Gallagher Dep. at 330–16 to 330–19, attached as Exh. B to Rosenberg Aff. (Question: "Other than this one bid, did you ever have any other differential in SPA between you and other dealers?" Answer: "Not that I have caught them on."). The one instance involved a bid on the sale of two trucks to be sold to Burlington County, New Jersey. Coast Cities placed a bid along with other dealerships, including two other International dealers, Garden State and Crossroads. Gallagher Dep. at 327–17 to 329–3, attached as Exh. B to Rosenberg Aff. Plaintiff claims that both Garden State and Crossroads received more price assistance than it

did, thereby undermining plaintiff's ability to pursue the contract with Burlington County. Plaintiff cannot recall to which company the bid was awarded. *Compare* Gallagher Dep. at 329–2 to 329–3, attached as Exh. B to Rosenberg Aff. ("I believe Garden State got the bid."), *with* Gallagher Dep. at 566–18 to 566–20, attached as Exh. C to Rosenberg Aff. (Question: "But you were beaten by General Engines?" Answer: "I don't know exactly which one of those.").

The Court must dismiss this claim. Plaintiff's inability to establish the company to which the bid was awarded precludes it from setting forth a viable claim, because it is impossible to determine whether the superior SPA that NITC allegedly awarded Garden State and Crossroads caused Coast Cities to lose the bid. NITC asserts that General Engines, an OEM, was awarded the contract, but apparently bases that assertion solely on a misinterpretation of Douglas Gallagher's testimony, set forth *supra*. If General Engines did win the bid, or if some other company unrelated to NITC did, then it would be impossible for Coast Cities to establish that NITC's refusal to provide the same SPA as Garden State and Crossroads caused plaintiff to lose the bid. In any event, in the absence of any knowledge as to the Burlington County bid winner, plaintiff has not set forth a prima facie case on this claim, and it must be dismissed.

■ The next claim of tortious interference amorphously alleges that NITC caused plaintiff "to finance its customers [sic] purchases of trucks with defendant Navistar Financial and then refus[ed] to do further business with plaintiff thereby causing plaintiff's limited liability penalty, paid in the event a customer's truck is repossessed by [NFC], to increase from 5% to 15%." Second Amended Complaint ¶ 48(c).

Defendants insist that NFC, at some point, refused to accept retail installment contracts from Coast Cities because plaintiff had defaulted on its Open Account and had refused to honor its recourse obligations on repossessed trucks. Bradley Aff. ¶ 31. Pursuant to the Retail Financing Arrangement of Trucks and Related Equipment ("Retail Financing Arrangement") between the parties,

either party could terminate the financing agreement at any time. *See* Bradley Aff. Exh. D ¶¶ 6a(1), (2). Defendants also maintain that NFC, as a party to the contract, could not have tortiously interfered with its own contract.

Notably, plaintiff's papers do not defend this claim against defendants' motion for summary judgment. And although the Court can not accept defendants' reasoning that NFC could not have interfered with the contract, because it is not clear whether plaintiff alleges interference with the Retail Financing Arrangement or Coast Cities' contracts with customers, it is clear that this claim must be dismissed. The Retail Financing Arrangement gave either party the right to terminate financing arrangements, and the record is clear that Coast Cities was frequently past due on its Open Account. Accordingly, plaintiff can not establish that defendants' conduct in this regard was malicious or wrongful, when NFC was merely exercising its contractual right. Indeed, despite Coast Cities' pending contractual relations with these or other customers, NITC retained a contractual right to terminate the entire Dealer Agreement if Coast Cities owed an outstanding balance on the Open Account. *See* Dealer Agreement at 16, attached as Exh. C to Smith Certif.

■■■ Next, plaintiff alleges that defendants NITC and NFC interfered with Coast Cities' contract with Matthews Bus. Plaintiff claims that defendants induced Matthews Bus to purchase a truck chassis through another dealership by offering it better financing terms. Second Amended Complaint ¶ 48(d). Therefore, plaintiff could not see its agreement with Matthews Bus through to fruition. *Id.*

Defendant challenges this claim by arguing that NFC simply offered superior floor plan financing to its own floor plan financiers than Associates offered to Coast Cities. Plaintiff does not disagree with this assertion, and the testimony of Douglas Gallagher substantiates it. Therefore, the Court can not find that NITC or NFC acted wrongfully or maliciously in simply offering better financing terms to competitors seeking the same deal.

■■■ Plaintiff next complains that defendants, specifically Harco, refused to issue bid and performance bonds to Coast Cities, despite Harco's knowledge that Coast Cities needed the bonds to obtain business, and despite Harco's issuance of bonds to other franchisees. Second Amended Complaint ¶¶ 48(e), (f). These allegations do not state a claim for tortious interference with prospective or existing contractual relations. As discussed above, a plaintiff must specify some reasonable expectation of economic benefit or, in other words, the existence of a contract or the likelihood that a contract with a particular party would have been actualized but for defendant's wrongful intercession. *See Printing Mart–Morristown,* 116 N.J. at 751–52, 563 A.2d 31; *Fregara,* 764 F.Supp. at 955. The claims set forth in paragraphs 48(e) and (f) of the Second Amended Complaint do not particularize the contracts that plaintiff would have executed, nor do they explain the wrongful conduct, or even allege the existence of it. Accordingly, these claims must be dismissed.

■■■ Similarly, paragraph 48(g) alleges that defendants allowed other dealerships, including Faulkner, Garden State and Mid Atlantic, "to take repossessed vehicles to their own truck lot where the dealers had the opportunity to resell the vehicles before having to commit to either pay the limited liability penalty amount or purchase the truck outright," without affording plaintiff the same opportunity. Second Amended Complaint ¶ 48(g). Again, Coast Cities fails to assert the existence of an existing or potential contractual relation that, but for defendants' malicious interference, would have been recognized. Instead, plaintiff merely takes issue with the apparently preferential rights upon repossession afforded other dealerships. Accordingly, this claim will be dismissed.

■■■ Plaintiff next alleges that defendants would not allow it to purchase trucks repossessed from plaintiff's customers. *Id.* ¶ 48(h). Plaintiff maintains that despite their knowledge that plaintiff had customers who wished to purchase those trucks, defendants NITC and NFC deliberately sold those trucks to another dealer for a lower amount.

*Id.* Defendant NITC asserts that these allegations do not allege a meritorious claim for tortious interference, but merely take issue with the parties' rights upon repossession of a vehicle.

Plaintiff's claim is contingent on its right to retake the equipment upon repossession. Coast Cities insists that the Dealer Agreement confers on the dealer the option, upon repossession, to purchase the truck itself, and that plaintiff sought to do so here, but could not, apparently due to some unexplained interference by Coast Cities. But the Dealer Agreement does not confer any such right, nor does it incorporate any other document that does. Moreover, the Retail Financing Agreement between plaintiff and NFC suggests that plaintiff did not have an absolute right upon repossession. Instead, it simply discusses the parties' respective liabilities upon repossession, and the dealer's obligations if it were to retake possession of equipment upon repossession. *See* Bradley Aff., Exh. D at D.5–D.6. Neither the Dealer Agreement nor the Retail Financing Agreement confers on plaintiff an unfettered right to resell a repossessed vehicle.

Plaintiff's failure to establish its contractual right to retake a repossessed vehicle is compounded by its failure to plead the nature of the alleged interference. The Complaint states only that NITC and NFC "refus[ed] to permit plaintiff to purchase trucks repossessed from plaintiff's customers … knowing that plaintiff had customers who wanted to purchase those trucks." Plaintiff's papers in opposition to defendants' motions for summary judgment do not address this claim at all.

Therefore, plaintiff has failed to set forth a prima facie claim of tortious interference. In the absence of a demonstrated contractual right to repossessed equipment, the Court can not conclude that plaintiff had a reasonable expectation of a contractual relationship, or that defendant wrongfully and intentionally interfered with that expectation by allegedly keeping the vehicle to deprive plaintiff of an opportunity to resell it. *See Printing–Mart Morristown*, 116 N.J. at 751–52, 563 A.2d 31. Accordingly, the Court will dismiss this claim.

■ Finally, in paragraph 48(i) of the Second Amended Complaint, plaintiff charges that defendants "dissuaded prospective customers from purchasing trucks or parts from plaintiff by informing them that Coast Cities [would] be out of business as of August 10, 1995." *Id.* ¶ 48(i). Defendants assert that this claim is meritless for two reasons. First, they assert that the statement was true, insofar as Coast Cities' International authorization was terminated by then, it had frequently been on C.O.D. status during 1990, 1991 and 1992, and was in bankruptcy since June, 1992. *See supra* pages 4–5. Second, they assert that Coast Cities has suffered no damages as a consequence of the statement, because none of their customers left for other dealers. On this latter point, defendants rely on the deposition testimony of Douglas Gallagher, who stated as follows:

A. (cont'd) And, as I said to you prior, that most of the customers didn't come to me and explain what was going on, because they were embarrassed. So they just went and started buying from Navistar.

A handful of the customers came to me and explained the dirty tactics that they were using. And they felt it was unbecoming of a Fortune 500 company to be doing this. And they brought it to my attention, and they wanted me to know about it.

Q. So they did not want to do business with Navistar because of that?

A. That's correct.

Q. And who would fall into that category, Eugene Foods?

A. The ones that I mentioned before.

Q. Canada Dry, A & J Produce, Walter Holmes?

A. Right.

Q. And how about Monmouth County Highway?

A. Monmouth County Highway, they can't. They have to buy from a low bid.

Q. So long as the bidder meets responsible bidding requirements?

A. That's correct.

Gallagher Dep. at 576–1 to 577–4, attached as Exh. C to Rosenberg Aff. Defendants therefore contend that all of the customers who

informed Gallagher of the statements either remained with Coast Cities because they resented NITC's conduct or, as with Monmouth County Highway, chose the dealer because they were legally required to sell to the lowest bidder.

Although it is not clear that all of plaintiff's customers either remained with Coast Cities because they resented the statement or chose their dealer based on the lowest bidder, this issue is inconsequential. The Court agrees with defendants' proposition that the alleged statements, even if made, are not actionable because they were true.

The Second Amended Complaint does not identify the recipient of the alleged statements, nor does it allege when defendants made them. Moreover, plaintiff's papers in opposition do not defend this claim, and therefore do not identify the circumstances under which it was allegedly made. However, the Court finds that the alleged statement may fairly be read to mean that as of August 10, 1992, Coast Cities would no longer be an authorized International dealer. If NITC made the statements to potential customers, presumably they would be to potential purchasers of NITC products and services. In short, it would be difficult to conceive of why a potential purchaser would communicate with NITC for non-International products and services.

In this context, the statements are not actionable because they were true. Coast Cities had lost its status as an authorized International dealer by May 14, 1992, when this Court denied its application for injunctive relief, and was in bankruptcy by August 10, 1992. Moreover, although the bankruptcy court enjoined termination of the agreement on July 6, 1992 and September 2, 1992, this Court reversed the bankruptcy court on December 2, 1992. *See In re Coast Cities Truck Sales, Inc.,* 147 B.R. at 678. Moreover, plaintiff itself recognized that it could not guarantee many repair services or parts availability because its ability to obtain the necessary parts was questionable, as a consequence of its C.O.D. status and bankruptcy filing. Thus, while Coast Cities had not terminated all operations by August 10, 1992, that fact does not render the alleged state-

ment untrue. The statement is properly construed only as to plaintiff's ability to offer NITC equipment and services. Given the loss of plaintiff's status as an authorized NITC dealer, its C.O.D. status, its inability to guarantee services and parts availability, and its financial problems, the Court does not find the statement untrue. Accordingly, the Court will dismiss this claim.

### E. Count IV: Breach of Implied Duties of Good Faith and Fair Dealing

Plaintiff alleges in Count IV that defendants, in committing the acts discussed *supra* at sections II(B)–II(D) of this Memorandum Opinion, violated their implied contractual duties of good faith and fair dealing. Second Amended Complaint ¶¶ 52–54.

 New Jersey common law and N.J.S.A. 12A:1–201(19) impose upon parties the obligation to exercise good faith in the performance of a contract for the sale of goods. *See Onderdonk v. Presbyterian Homes of N.J.,* 85 N.J. 171, 182, 425 A.2d 1057 (1981); *Glenfed Financial Corp. v. Penick Corp.,* 276 N.J.Super. 163, 175, 647 A.2d 852 (1994), *certif. denied,* 139 N.J. 442, 655 A.2d 444 (1995). *See also* N.J.S.A. 12A:1–203 (West 1962) ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement."). New Jersey's version of the Uniform Commercial Code defines good faith as "honesty in fact in the conduct or transaction concerned." N.J.S.A. 12A:1–201(19) (West Supp.1995). The duty of good faith does not, however, alter the terms of a written agreement. *Rudbart v. North Jersey District Water Supply Comm'n,* 127 N.J. 344, 366, 605 A.2d 681 *cert. denied,* 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992).

 Having determined that the alleged violations of sections 1 and 2 of the Sherman Act must be dismissed, and that plaintiff's claims for tortious interference do not survive defendants' motions for summary judgment, the Court must dismiss plaintiff's claims for breach of good faith and fair dealing. As the facts underlying these claims did not support plaintiff's claims for tortious interference, they also fail to demonstrate that

defendants were derelict in fulfilling their obligations of good faith and fair dealing during performance of the Dealer Agreement and the Retail Financing Agreement.

### F. COUNT V: VIOLATIONS OF N.J.S.A. 12A:9-504 AND N.J.S.A. 12A:9-506

 In Count V of the Second Amended Complaint, plaintiff alleges that defendants' failure to dispose of collateral securing debts guaranteed by plaintiff violates N.J.S.A. 12A:9-504,[13] and that defendant's refusal to allow plaintiff to redeem collateral violates N.J.S.A. 12A:9-506.[14] Second Amended Complaint ¶¶ 56, 57. Count V must be dismissed for failure to plead adequately the facts forming the gravamen of the claims. The Second Amended Complaint fails to specify which defendant(s) allegedly violated the statutes; nor does it articulate the alleged acts by which the unnamed defendant(s) committed the violations. Rather, it merely states the legal conclusion that the statutes were violated. Plaintiff's papers in opposition are equally bereft of any support for, or insight into, the factual circumstances surrounding these claims, much less the applicability of N.J.S.A. 12A:9-504 and 12A:9-

13. This statute provides in relevant part:
(1) A secured party may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing.... The proceeds of disposition shall be applied in the order following to
(a) The reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;
(b) The satisfaction of indebtedness secured by the security interest under which the disposition is made;
(c) The satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed....
N.J.S.A. 12A:9-504 (West Supp.1995).

14. This statute provides as follows:
At any time before the secured party has disposed of collateral or entered into a contract for its disposition under 12A:9-504 or before

506.[15] Accordingly, the Court will dismiss Count V of the Second Amended Complaint.

### G. COUNT VI: VIOLATIONS OF THE NEW JERSEY FRANCHISE PRACTICES ACT

Both plaintiff and defendants seek summary judgment on Count VI of the Second Amended Complaint. In Count VI, plaintiff claims that defendant NITC, as a franchisor, has violated the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 et seq., by selling trucks and other products directly to end-users, including NITC's national fleet account sales and reservation of rights to sell to OEMs and other end-users.

The New Jersey Franchise Practice Act ("NJFPA") provides in relevant part:

It shall be a violation of this act for any motor vehicle franchisor, directly or indirectly, through any officer, agent, employee, broker or any shareholder of the franchisor, except a shareholder of 1% or less of the outstanding shares of any class of securities of a franchisor which is a publicly traded corporation, or other person, to offer to sell or sell motor vehicles, to a consumer, other than an employee of the franchisor, except through a motor vehicle franchisee.

the obligation has been discharged under 12A:9-505(2) the debtor or any other secured party may unless otherwise agreed in writing after default redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as the expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and to the extent provided in the agreement and not prohibited by law, his reasonable attorneys' fees and legal expenses.
N.J.S.A. 12A:9-506 (West 1962).

15. The only documentation that might loosely be termed "support" for this claim is found in the certification of Douglas Gallagher, which offers merely one instance wherein NITC repossessed a truck that plaintiff wanted to sell to another customer. Gallagher Certif. ¶ 60. These facts underlie plaintiff's claim for tortious interference and breach of N.J.S.A. 12A:1-201(19). However, neither the Second Amended Complaint, nor plaintiff's papers in opposition to defendants' motions for summary judgment, adequately explain the applicability of N.J.S.A. 12A:9-504 and N.J.S.A. 12A:9-506 to these facts.

N.J.S.A. 56:10–27 (West 1989). The NJFPA defines a consumer as "the purchaser, other than for resale, of a motor vehicle[.]" N.J.S.A. 56:10–26(a) (West Supp.1995). The NJFPA defines a franchise as

> a written agreement for a definite or indefinite period in which a motor vehicle franchisor grants a right or license to use a trade name, trademark, service mark or related characteristics and in which there is a community of interest in the marketing of new motor vehicles at retail, by lease, agreement or otherwise[.]

N.J.S.A. 56:10–26(b) (West Supp.1995). A motor vehicle franchisor is defined as

> a person [including a corporation or partnership] engaged in the business of manufacturing, assembling or distributing new motor vehicles, or importing into the United States new motor vehicles manufactured or assembled in a foreign country, who will under normal business conditions during the year, manufacture, assemble, distribute or import at least 10 new motor vehicles[.]

N.J.S.A. 56:10–26(e) (West Supp.1995). "Motor vehicle," for purposes of the Act, includes all trailers and tractors designed primarily to transport persons or property. N.J.S.A. 56:10–26(c) (West Supp.1995). Finally, the NJFPA defines a motor vehicle franchisee as "a person [including a corporation or partnership] to whom a franchise is granted by a motor vehicle franchisor and who or which holds a current valid motor vehicle franchisor's license issued pursuant to [N.J.S.A.] 39:10–19 and has an established place of business." N.J.S.A. 56:10–26(d) (West Supp. 1995).

Defendants first respond that the NJFPA is an unconstitutional restraint on the Commerce Clause of Article I of the United States Constitution, which provides that "Congress shall have Power ... To regulate Commerce ... among the several States." U.S. CONST. art. I, § 8, cl. 3. Defendants aver that the NJFPA regulates interstate commerce because most, if not all, of the truck sales by NITC to New Jersey end-users, including the State of New Jersey, originate in Kansas, where the paperwork for fleet account sales is prepared. Moreover, although the end-user might be a New Jersey citizen or institution, often the delivery of the fleet is to another state or, in some case, Canada. For example, one NITC customer, RJR Nabisco, headquartered in New Jersey, sought delivery of International trucks to a branch located outside of New Jersey. But because the sale was to RJR Nabisco in New Jersey, NITC maintains, NJFPA would prohibit the sale. Compliance with NJFPA would require NITC to sell through New Jersey dealers, which might or might not have the capacity to accommodate the sales, thereby invariably driving up the costs to the consumers, either in New Jersey or in other states. Defendants assert that in this regard, NJFPA regulates interstate commerce, is economically protectionist legislation, and is therefore unconstitutional.

Defendants also contend that N.J.S.A. 56:10–26 is unconstitutionally vague, because the prohibition on franchisors from selling "directly and indirectly," N.J.S.A. 56:10–27, obfuscates the intended reach of the NJFPA. In short, defendants argue that it is impossible to determine what constitutes a "direct sale," what is an "indirect sale," and what is not prohibited by the NJFPA.

Defendants also offer two arguments that do not attack the constitutionality of the NJFPA. First, they argue that the Act can fairly be read not to include NITC sales to its national fleet account sales. Defendants point out two factors that support this narrow reading of the NJFPA: (1) that the statute grants to franchisees the exclusive right to market vehicles in New Jersey; and (2) that New Jersey itself has purchased trucks directly from NITC. As to this latter factor, it is worth noting that the New Jersey Division of Motor Vehicles issued a dealer's license to NITC, which allowed NITC to satisfy one of the prerequisites to selling vehicles in the state, pursuant to N.J.S.A. 39:10–19.

Second, defendants argue that, in any event, plaintiff lacks standing to sue under the NJFPA because it neither seeks to enjoin violations of it, nor has it suffered an injury by NITC's direct sales to national fleet accounts in New Jersey. Defendants contend that this Court must conclude that

Coast Cities has suffered no damages because plaintiff has failed to respond to interrogatories asking it to set forth that factual basis by which it claims an injury.

Plaintiff fails to address the latter two arguments, but instead devotes its entire discussion to refuting defendant's attack on the statute's constitutionality under the Commerce Clause. *See* Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 55–58. Plaintiff asserts that this Court can not find the NJFPA unconstitutional at this point because, pursuant to 28. U.S.C. § 2403, the Court must first certify the constitutionality issue to the Attorney General of the State of New Jersey. The Court must then allow the state Attorney General the opportunity to intervene in the litigation, to offer its opinion on the constitutionality issue. Because this Court has not yet certified the issue to the state Attorney General, or otherwise allowed it to intervene, plaintiff insists that the issue is not ripe for adjudication.

In the alternative, plaintiff posits that the NJFPA is not unconstitutional, because pursuant to *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 35 F.3d 813 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995), and *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the statute does not constitute a per se burden on interstate commerce. Instead, plaintiff contends, the NJFPA infringes interstate commerce only to the extent private parties, such as NITC, enter into an agreement with a New Jersey customer for the direct delivery of product by NITC.

The Court must first consider the arguments that do not attack the constitutionality of the NJFPA, and should consider the constitutionality issues only if the NJFPA claims can not be resolved on alternate grounds. *See Ashwander v. TVA*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (stating that courts should avoid constitutional rulings if possible); *NUI Corp. v. Kimmelman*, 765 F.2d 399, 403 (3d Cir.1985) ("courts should avoid whenever possible a premature adjudication that duly enacted legislation is unconstitu-

tional"); *Carreras v. City of Anaheim,* 768 F.2d 1039, 1042–43 (9th Cir.1985) (same).

■ The Court rejects defendants' argument that Coast Cities has not suffered any harm from the alleged violation of the NJFPA. While the Court does not countenance failure to comply with discovery mandates, there is no indication that plaintiff actually violated the discovery rules, or that NITC, even if unsatisfied with the interrogatory responses, moved to compel more complete answers. Moreover, it seems quite possible that Coast Cities, as well as other New Jersey dealers, could have benefitted from sales to national fleet accounts based in New Jersey. Defendants admit that plaintiff received fleet leader credits and sold parts and services to national fleet accounts, *see* Defendants' Local Rule 12(G) Statement ¶¶ 72–73, 103, even though those accounts might not have been within Coast Cities' AOR. Defendants have not presented the Court with any evidence which could conclusively establish that Coast Cities could not have sold at least some trucks to a fleet account based in New Jersey. Moreover, as noted *supra,* a dealership is not limited to sales within its AOR, and may reach out of its area to make a sale. Therefore, there is clearly a genuine issue of material fact as to whether plaintiff has suffered an injury from the alleged violations of the NJFPA.

The other arguments posited by defendants, and those by plaintiff, are either directed to the constitutionality of the statute or proffer a narrower construction of the NJFPA which, defendants aver, would not unconstitutionally burden the Commerce Clause. Accordingly, the Court must initially consider whether it can engage in an analysis of the NJFPA's constitutional posture, or whether it is more appropriate to abstain from the inquiry under *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), which set forth the now well entrenched doctrine of *Pullman* abstention.

■ Abstention pursuant to *Pullman* is appropriate "when a federal court is presented with both a federal constitutional issue and an unsettled issue of state law whose

resolution might narrow or eliminate the federal constitutional question." *Chez Sez III Corp. v. Township of Union,* 945 F.2d 628, 631 (3d Cir.1991), *cert. denied,* 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992). Abstention in this manner is intended to serve two general functions: (1) avoid unnecessary constitutional pronouncements; and (2) avoid undue interference with state programs. *United States v. City of Pittsburgh,* 757 F.2d 43, 45 (3d Cir.1985). *See also Pullman,* 312 U.S. at 500–01, 61 S.Ct. at 645–46 (offering three justifications for abstention: (1) avoid needless "friction" between federal and state judiciaries; (2) reduce likelihood of erroneous interpretations of state law; and (3) avoid unnecessary constitutional rulings). *But see* ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 12.2, at 690–91 (Little, Brown & Co.1994) (hereinafter FEDERAL JURISDICTION) (noting scholarly criticism with the principles underlying *Pullman* abstention and the substantial costs incurred in its application).

 Within the Third Circuit, the following three "special circumstances" must exist before a court may abstain under *Pullman:*

First, there must be uncertain issues of state law underlying the federal constitutional claims brought in the federal court. Second, these state law issues must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law by the federal court would be disruptive of important state policies.

*D'Iorio v. County of Delaware,* 592 F.2d 681, 686 (3d Cir.1978), *overruled on other grounds, Kershner v. Mazurkiewicz,* 670 F.2d 440, 448 (3d Cir.1982) (en banc). *See Kusper v. Pontikes,* 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973) (holding abstention appropriate only where is substantial uncertainty as to meaning of the state law and there is a reasonable possibility of state court clarification to circumvent need for federal constitutional ruling). More recent Supreme Court pronouncements seem to favor a substantial likelihood that a state

court interpretation could resolve the question without reaching the federal constitutional issue. *See* FEDERAL JURISDICTION § 12.2, at 692 (citing *Reetz v. Bozanich,* 397 U.S. 82, 86–87, 90 S.Ct. 788, 790, 25 L.Ed.2d 68 (1970); *Harman v. Forssenius,* 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965)). Once these factors are satisfied, the court must determine whether various equitable factors militate against abstention. *Independence Public Media of Philadelphia, Inc. v. Pennsylvania Public Television Network Comm'n,* 808 F.Supp. 416, 430 (E.D.Pa. 1992). These equitable factors include the availability of an adequate state remedy, the length of time the litigation has been pending, and the potential impact of further delay on the parties. *Id. See also Hughes v. Lipscher,* 906 F.2d 961, 964 (3d Cir.1990). These factors must be weighed against the natural presumption that federal courts are bound to adjudicate cases over which they have jurisdiction. *Chez Sez,* 945 F.2d at 630 (citing *New Orleans Public Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)). *See also Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.").

 The first consideration in this abstention analysis is whether the statute is manifestly unclear, thereby rendering it vulnerable to defendants' assertion that it is unconstitutionally vague. The Supreme Court has instructed as follows:

Where a case turns on the applicability of a state statute or regulation to a particular person or a defined course of conduct, resolution of the unsettled question of state law may eliminate any need for constitutional adjudication. Abstention is therefore appropriate. Where, however ... the statute or regulation is challenged as vague because individuals to whom it plainly applies simply cannot understand what is required of them and do not wish to forswear all activity arguably within the scope of the vague terms, abstention is not required.

*Procunier v. Martinez,* 416 U.S. 396, 401 n. 5, 94 S.Ct. 1800, 1806 n. 5, 40 L.Ed.2d 224 (1974), *overruled on other grounds, Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

█ In this case, the Court rejects defendants' challenge to the law as unconstitutionally vague. Defendants base this challenge solely on the "directly or indirectly" language of N.J.S.A. 56:10–27. This language, they contend, does not allow for distinctions between prohibited and permissible sales by franchisors to consumers, insofar as it seems to prohibit all of them. Nevertheless, they question whether the statute would apply to prohibit a sale to a customer headquartered in New Jersey, but receiving the trucks in another state or country. Similarly, they question whether the statute would prohibit a sale to a customer headquartered in another state, but receiving the trucks in New Jersey.

Contrary to defendants' reasoning, this ambiguity does not render the statute constitutionally infirm. Such a conclusion would first require the Court to find the NJFPA "so vague and standardless" as to "leave the public uncertain as to the conduct it prohibits" or to leave "judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio v. Pennsylvania,* 382 U.S. 399, 402–03, 86 S.Ct. 518, 520–21, 15 L.Ed.2d 447 (1966). *See also Germanio v. Goodyear Tire and Rubber Co.,* 732 F.Supp. 1297, 1301 (D.N.J.1990) (quoting *Giaccio,* 382 U.S. at 402–03, 86 S.Ct. at 521).

The NJFPA defines "motor vehicle" to specifically include the medium- and heavy-duty trucks at issue here, as well as the terms "franchisor" and "consumer." Therefore, the scope of actors is reasonably clear, at least from the plain language of the statute. Moreover, the scope of conduct that the NJFPA seeks to govern is reasonably ascertainable from both the language of N.J.S.A. 56:10–27 itself, and from legislative pronouncements accompanying passage of the statute. The Assembly Commerce and Industry Committee Statement accompanying the legislation provides in pertinent part: "This bill is designed to prohibit the manu-

facturers, distributors and importers of motor vehicles from engaging in the business of new car sales and therefore to prevent the replacement of the State's independently-owned franchises with manufacturer-controlled dealerships." Assembly Commerce and Industry Committee Statement, No. 2117, L.1985, c. 361. *See* N.J.S.A. 56:10–26, at 668 (West 1989). Read in this context, the Act is sufficiently clear to place motor vehicle manufacturers on notice that the direct sale of a motor vehicle, including a medium-duty or heavy-duty truck, to a New Jersey customers is prohibited. The NJFPA delineates its objectives and the provides definitions of those persons it covers, and therefore affords fair warning, at least in general terms, of the proscribed conduct. The Court therefore finds that the statute, while ambiguous in some respects, *see infra,* passes constitutional muster, particularly when measured against the less strict void-for-vagueness standard for economic regulations. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *Leonen v. Johns–Manville Corp.,* 717 F.Supp. 272, 279 (D.N.J.1989). It is also worth noting that other courts construing and applying the "directly or indirectly" language in other provisions of the NJFPA, have not found the language so amorphous as to preclude interpretation. *See, e.g., O'Shea v. Amoco Oil Co.,* 886 F.2d 584, 589 (3d Cir.1989) (construing language of N.J.S.A. 56:10–7(e), which provides that a franchisor may not "directly or indirectly, through any officer, agent or employee ... impose unreasonable standards of performance upon a franchisee"); *Regency Oldsmobile, Inc. v. General Motors Corporation,* 723 F.Supp. 250, 273 (D.N.J.1989) (interpreting N.J.S.A. 56:10–7(f), which prohibits franchise lease terms that directly or indirectly violate other provisions of the NJFPA); *Monmouth Chrysler–Plymouth, Inc. v. Chrysler Corp.,* 102 N.J. 485, 493, 509 A.2d 161 (1986) (observing that N.J.S.A. 56:10–5, and the Act generally, seek to prohibit "wrongful terminations of franchises achieved either directly or indirectly.") (citing *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 502 F.Supp. 637, 653 (D.N.J.1980)).

■ Having found that the NJFPA is not unconstitutional on its face for vagueness, thereby leaving only the issue of whether the Act violates the Commerce Clause, the Court must now consider the three-step analysis set forth by the Third Circuit. The first factor is whether the statutory language is "clear and unmistakable." *Hughes*, 906 F.2d at 965. While the Court concludes that the Act is not unconstitutionally vague, it can not find the language unmistakably clear. As defendants note, the language of the Act, and the committee statement accompanying N.J.S.A. 56:10–26, leave some question as to its intended applicability to inter-state versus intra-state transactions. Defendants appropriately question, for example, its applicability to a fleet account sale where the actual purchaser is headquartered in New Jersey, but the trucks are delivered elsewhere. It may be that the Act is intended to compel a manufacturer, regardless of its location, to utilize a New Jersey dealer for any transaction in which the end-user is a New Jersey customer. *See Warnock Automotive Group, Inc. v. New Jersey*, 272 N.J.Super. 450, 454–55, 640 A.2d 332 (App.Div.1994) ("The Legislature, in passing N.J.S.A. 56:10–28, was clearly concerned with the maintenance of a network of independent distributors in New Jersey, and determined that direct competition between motor vehicle franchisors and motor vehicle franchisees would threaten that goal.").

Such a measure would present potentially troublesome Commerce Clause implications, as it would affect any instance in which an out-of-state motor vehicle manufacturer seeks to deal with New Jersey purchasers, and would force that manufacturer to deal through a New Jersey dealer. Viewed in this light, N.J.S.A. 56:10–27 seems capable of burdening commerce and promoting economic protectionism of New Jersey dealers.[16]

■ As noted above, the Commerce Clause endows Congress with the power to regulate commerce among the states. The Supreme Court "long has recognized that this affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." *Healy v. Beer Institute*, 491 U.S. 324, 326 n. 1, 109 S.Ct. 2491, 2494 n. 1, 105 L.Ed.2d 275 (1989). There are two levels of scrutiny in analyzing state regulations of interstate commerce:

> When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute only has indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986) (citations omitted). Ultimately, the dispositive consideration is statute's overall effect on local and interstate commerce. *Instructional Systems, Inc.*, 35 F.3d at 824 (quoting *Healy*, 491 U.S. at 337 n. 14, 109 S.Ct. at 2500 n. 14).

■ This is not a case of a per se violation of the Commerce Clause. The dormant Commerce Clause focuses on statutes discriminating against interstate commerce; these are virtually per se invalid. *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 87, 107 S.Ct. 1637, 1648–49, 95 L.Ed.2d 67 (1987). *See also Instructional Systems, Inc.*, 35 F.3d at 824 (citing cases). The NJFPA does not, however, distinguish New Jersey

---

**16.** For example, it appears that several of NITC's national fleet accounts, including the State of New Jersey, Biddle and National Freight, are headquartered in New Jersey. Cancelliere Aff. ¶ 8. But NITC insists that it made the sales to these accounts outside of New Jersey, and that it transferred title and completed the paperwork outside of New Jersey. *Id.* Moreover, defendant maintains that "[v]irtually all of the deliveries of

vehicles to the State of New Jersey and to Biddle were made at or through" its dealership in Penndel, Pennsylvania, which received the fleet leader credit for those sales. *Id.* Similarly, NITC contends that while Nabisco and Airco Gases are headquartered in New Jersey, most of the vehicles sold to those accounts are delivered outside of New Jersey. *Id.*

motor vehicle franchisors from out-of-state vehicle franchisors, and therefore does not discriminate against interstate commerce. *Instructional Systems, Inc.,* 35 F.3d at 824. Defendants concede that the statute

> appears to apply equally to sales by (1) a New Jersey manufacturer to customers headquartered and located outside of New Jersey, (2) a foreign manufacturer to customers headquartered in New Jersey, but located outside of New Jersey, (3) a foreign manufacturer to customers headquartered outside of New Jersey, but located within New Jersey, and (4) a foreign manufacturer to customers headquartered and located within New Jersey, but where title changes hands outside of New Jersey.

Defendant NITC's Brief in Support of Summary Judgement at 46 n. 39. Defendants aver that while N.J.S.A. 56:10–27 does not discriminate in favor of in-state manufacturers, if any exist, it nevertheless regulates interstate commerce in manner that has substantial extraterritorial effects.

Plaintiff maintains that the Third Circuit's construction of the NJFPA in *Instructional Systems, Inc.* controls this case. In that decision, the Third Circuit determined that N.J.S.A. 56:10–3, N.J.S.A. 56:10–4 and N.J.S.A. 56:10–5[17] did not have an unconstitutional extraterritorial effect, because the NJFPA sought to protect business parties that "made a franchise-specific capital investment of either goods or services in New Jersey." *Instructional Systems, Inc.,* 35 F.3d at 825. The court observed as follows:

> [I]t was the parties, not New Jersey, who contemplated that the franchisee maintain a place of business in New Jersey. And it was the parties, not New Jersey, who bound themselves to an exclusive multi-

state distribution agreement. Therefore, it is the parties' own agreement which operated to project the New Jersey law outside of New Jersey's borders....

*Id.* The court then distinguished the facts before it from those in *Healy* and *Brown–Forman Distillers Corp.,* wherein states enacted price-affirmation statutes requiring distributors to attest that their prices in those states were no more than those charged in bordering states. *Id.* at 826. The Third Circuit explained that in those cases, "[the] laws were designed in such a way that a supplier's price in other states would be dependent on the prices it posted in the state enacting the regulation." *Id.* Thus, it was the states themselves, independent of any agreements among the parties, which dictated the extraterritorial effect of the legislation. *Id.*

The Third Circuit's decision in *Instructional Systems, Inc.* is distinguishable from the instant issue in one crucial respect. In that case, the NJFPA applied to the transaction by virtue of the parties' decision to have the franchisee maintain a place of business in New Jersey. *Instructional Systems, Inc.,* 35 F.3d at 825. Had the parties not so chosen, or otherwise reconfigured the transaction, the NJFPA might never have applied there. In this case, application of the NJFPA may arise from the mere sale of product to New Jersey end-users or, in fact, to end-users headquartered outside of New Jersey but with operations within the state. Under those circumstances, it seems likely that application of the NJFPA would have potentially substantial extraterritorial effects. Moreover, it is simply impossible to predict whether, in those situations, choice-of-law principles would invoke the NJFPA, thereby

---

17. N.J.S.A. 56:10–3(a) defines "franchise" as

> a written agreement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J.S.A. 56:10–3(a) (West 1989). N.J.S.A. 56:10–4, before its amendment in 1993, limited application of the NJFPA as follows: "This Act applies only to a franchise ... the performance of which contemplates or requires the franchisee to estab-

lish or maintain a place of business within the State of New Jersey." N.J.S.A. 56:10–4 (West 1989). Finally, N.J.S.A. 56:10–5 provides as follows:

> It shall be a violation of this act for any franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, canceling, or failure to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.

N.J.S.A. 56:10–5 (West 1989).

rendering those fleet sale transactions invalid. Again, this case differs materially from the analysis in *Instructional Systems, Inc.*, which contemplated a more predictable choice-of-law analysis based on the parties' expectations as reduced in the franchise agreement. *See Instructional Systems, Inc.*, 35 F.3d at 825–26.

Moreover, as the Third Circuit noted in *Instructional Systems, Inc.*, the fact that a statute is triggered by in-state activity does not save it from a finding of unconstitutionality under the dormant Commerce Clause. *Id.* at 825. *See, e.g., Brown–Forman*, 476 U.S. at 580, 106 S.Ct. at 2085 ("The mere fact that the effects of New York's ABC Law are triggered only by sales of liquor within the State of New York ... does not validate the law if it regulates the out-of-state transactions of distillers who sell in-state."); *Edgar v. MITE Corp.*, 457 U.S. 624, 641–42, 102 S.Ct. 2629, 2640–41, 73 L.Ed.2d 269 (1982) (holding that corporation's contacts with Illinois were insufficient to allow Illinois to regulate that corporation's takeovers); *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 93, 107 S.Ct. 1637, 1651–52, 95 L.Ed.2d 67 (1987) (holding that fact that company was incorporated in Indiana and had numerous Indiana shareholders permitted Indiana to regulate company's takeovers).

Accordingly, the Court deems it necessary to invoke the *Pullman* abstention doctrine. It can not decide the constitutionality of the statute without first knowing its applicability to: (1) sales to a foreign manufacturer to customers headquartered in New Jersey, but located outside of New Jersey; (2) sales to a foreign manufacturer to customers headquartered outside of New Jersey, but located within New Jersey; and (3) sales to a foreign manufacturer to customers headquartered and located within New Jersey, but where title changes hands outside of New Jersey. In the absence of a clearer understanding of the scope of N.J.S.A. 56:10–26 and N.J.S.A. 56:10–27, it can not determine

the extraterritorial effects they may have in these types of transactions. It may be that the NJFPA was intended to apply solely to fleet account sales to end-users situated in New Jersey, such as the State of New Jersey.[18] Such an instance may not have an unduly burdensome extraterritorial effect. But if the state legislature intended the NJFPA to apply to a transaction in which the trucks were not ultimately destined for New Jersey, but were purchased by a New Jersey corporation, such as Nabisco, the NJFPA would present qualitatively different extraterritorial effects. Transactions that involve New Jersey only tangentially would now require operations be carried on within the state. Such statutes, or particular applications thereof, have been consistently stricken as unduly burdensome under the Commerce Clause. *See, e.g., Pike v. Bruce Church*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Healy*, 491 U.S. at 336–37, 109 S.Ct. at 2499–2500; *Brown–Forman*, 476 U.S. at 580, 106 S.Ct. at 2084–85.

The Court also finds that the other elements of *Pullman* abstention are satisfied. First, it appears likely that the statute is "amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the constitutional issues." *Chez Sez*, 945 F.2d at 632 (citations omitted). Although a state court interpretation of a challenged provision can not dispositively eliminate uncertainty as to its constitutionality, a potential state court interpretation that confines or moots the federal constitutional challenge weighs in favor of abstention. *United Services Auto Ass'n*, 792 F.2d at 361 (citing *Bellotti v. Baird*, 428 U.S. 132, 148, 96 S.Ct. 2857, 2866–67, 49 L.Ed.2d 844 (1976)).

As explained above, N.J.S.A. 56:10–26 and N.J.S.A. 56:10–27 are potentially subject to interpretations that would narrow or moot the constitutional inquiry. For example, confining the applicability of the Act to transactions involving end-users within New Jersey would likely moot the constitutional issue. It

---

**18.** It may not even apply to such end-users. It should be noted that the State of New Jersey is one of NITC's national fleet accounts. In light of this situation, the state court may wish to allow the Attorney General of the State of New Jersey to intervene in the proceedings, both as to the proper construction of the NJFPA, and as to how it does not apply to the sales to the State.

would, at a minimum, substantially narrow the extraterritorial effect of the NJFPA.

Second, the State of New Jersey has significant interest in the protection of its franchises and, in this case, dealers. The State Legislature professed as such in its Assembly Statement, wherein it expressed concern that independently owned or managed franchises not be replaced by manufacturer-controlled dealerships. *See supra* page 52 (quoting Assembly Commerce and Industry Committee Statement, No. 2117, L.1985, c. 361). In view of the State's interest in the protection and nurturing of its franchises and dealerships, an erroneous decision by this Court could significantly disrupt implementation of those policies.

Finally, the Court does not find that equitable considerations militate against abstention. *Stretton v. Disciplinary Board of the Supreme Court of Pennsylvania,* 944 F.2d 137, 140–41 (3d Cir.1991); *Biegenwald v. Fauver,* 882 F.2d 748, 753–54 (3d Cir.1989). Although the abstention will cause further delay in this matter, which already has been pending for three years, neither party will suffer irreparable harm. Consideration of this narrow issue is not likely to substantially affect Coast Cities' or NITC's continued viability. Moreover, in view of the other considerations, any inconvenience or delay is clearly outweighed by the need for an accurate construction of the statute before adjudicating its constitutionality.

■■■ The Court recognizes that abstention is rare, and most often prohibited, in diversity cases involving an unsettled issue of state law. *See Instructional Systems, Inc.,* 35 F.3d at 819 (quoting *Urbano v. Board of Managers of New Jersey State Prison,* 415 F.2d 247, 253 (3d Cir.1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970)). However, the foregoing discussion reveals that there is substantial uncertainty as to the NJFPA's applicability to NITC's sales to New Jersey and other national fleet account customers within and outside of the state. Equally significant, it seems quite possible that if the NJFPA does so apply to bar those sales, very substantial questions of federal constitutional law would have to be confronted. Accordingly, the Court con-

cludes that abstention is appropriate in this case, despite the fact that this Court has both original jurisdiction over the dispute pursuant to 28 U.S.C. § 1332(a), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

■■■ Finally, it should be noted that this Court, in abstaining on the constitutionality of N.J.S.A. 56:10–26 and N.J.S.A. 56:10–27, does not abdicate its role in determining the remaining issues in this matter. Instead, it merely postpones adjudication of the remaining issues until after state court determination of the state law issue. *Georgevich v. Strauss,* 772 F.2d 1078, 1094 (3d Cir.1985), *cert. denied,* 475 U.S. 1028, 106 S.Ct. 1229, 89 L.Ed.2d 339 (1986). Pursuant to the doctrine of *England* reservation, plaintiff, if it is so entitled, may reserve its right to return to this Court for a final resolution of the remaining issues. *See generally England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

The proper procedure is for this Court to retain jurisdiction of the federal action while the parties seek resolution of the state law issue of the scope of N.J.S.A. 56:10–26 and N.J.S.A. 56:10–27 in state court. *American Trial Lawyers Ass'n v. New Jersey Supreme Court,* 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973). *See also* 17A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4243, at 64–65 (2d ed. 1988) (noting that a federal court abstaining under *Pullman* should not dismiss the action, but retain jurisdiction pending the state court proceedings). Once the state court proceeding is complete, and assuming the parties have properly reserved their rights under *England,* plaintiff will retain the right to return to this Court for a determination of the remaining claims.

H. COUNT VII: UNFAIR COMPETITION

In Count VII of the Second Amended Complaint, plaintiff asserts that defendants' actions constituted "unfair competition," as they were a deliberate attempt to drive plaintiff out of business and "a violation of established business ethics and customs in the truck dealership business." Plaintiff appar-

ently relies on the same factual allegations underlying Counts III and IV.

The amorphous nature of unfair competition makes for an unevenly developed and difficult area of jurisprudence. *See Columbia Broadcasting System, Inc. v. Melody Recordings, Inc.,* 134 N.J.Super. 368, 375, 341 A.2d 348 (App.Div.1975) ("[B]ecause the common law of unfair competition has evolved unevenly over the years, judicial applications in this tort field have not always been uniform or fixed."). While its boundaries are, at a minimum, uncertain, courts applying New Jersey common law principles agree that it seeks to espouse some baseline level of business fairness. *Id.* at 375–76, 341 A.2d 348; *New Jersey Optometric Ass'n v. Hillman–Kohan Eyeglasses, Inc.,* 144 N.J.Super. 411, 427, 365 A.2d 956 (Ch.Div. 1976), *aff'd,* 160 N.J.Super. 81, 388 A.2d 1299 (1978). By incorporating other causes of action, including tortious interference, breach of duties of good faith and fair dealing, misappropriation and defamation, it applies a flexible and elastic standard of conduct in the commercial context. However, these same characteristics, when condensed in one general rubric, defy concrete standards by which to gauge an alleged instance of unfair competition. *Compare C.R. Bard, Inc. v. Wordtronics Corp.,* 235 N.J.Super. 168, 172, 561 A.2d 694 (applying standards for tortious interference to claim for unfair competition), *with Columbia Broadcasting System, Inc.,* 134 N.J.Super. at 376, 341 A.2d 348 (applying unfair competition analysis in context of "palming off" claim); *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.,* 625 F.2d 1055, 1062 (3d Cir.1980) (finding two torts of unfair competition under New Jersey law: (1) palming off; and (2) unprivileged imitation).

In this case, plaintiff predicates its unfair competition claims on the same factual allegations forming the gravamen of its tortious interference and breach of contract claims, discussed in sections II(D) and II(E) of this Memorandum Opinion. *See* Second Amended Complaint ¶¶ 66–70. *See also supra* pages 39–42. While the elements for unfair competition are not entirely clear, it seems likely that New Jersey law would find

unfair competition where there has been tortious interference, which requires a demonstration of malice, or upon a finding of breach of good faith and fair dealing. This observation derives from the standards for tortious interference, see *supra* pages 33–34, and breach of good faith, *see supra* pages 41–42, measured against the objective of unfair competition, which is to reinforce fair dealing and scrupulous conduct on the commercial level. *See C.R. Bard, Inc.,* 235 N.J.Super. at 172–73, 561 A.2d 694; *Columbia Broadcasting System, Inc.,* 134 N.J.Super. at 376, 341 A.2d 348 (quoting *Sachs Furniture & Radio Co. v. Sachs Quality Stores Corp.,* 39 N.J.Super. 70, 85, 120 A.2d 477 (App.Div.1956)).

In this case, however, the Court has already determined that plaintiff's claims for tortious interference and breach of good faith and fair dealing do not withstand defendants' motions for summary judgment. It follows that they also fail to support Coast Cities' claim for unfair competition. Therefore, the Court will grant defendants' motions for summary judgment as to Count VII.

### I. COUNT VIII: PUNITIVE DAMAGES UNDER 15 U.S.C. § 15

Section 15 of Title 15 provides for an award of punitive damages, in an amount up to three times the damages awarded plaintiff, for a violation of Title 15. *See* 15 U.S.C.A. § 15(a) (West Supp.1995). In this case, it is clear that plaintiff is not entitled to punitive damages, as this Court has concluded that plaintiff has not suffered a cognizable antitrust injury, and has dismissed Counts I and II of the Second Amended Complaint. Accordingly, Count VIII of the Second Amended Complaint is dismissed.

### J. DEFENDANTS' COUNTERCLAIMS AGAINST THOMAS AND DOROTHY GALLAGHER

Finally, defendants NFC and Harco seek summary judgment on Counts I and II of their counterclaims against Thomas Gallagher and Dorothy Gallagher. As noted above, the counterclaims allege that the

counterclaim defendants [19] owe a liquidated sum of $127,890.31 on the Open Account. *See supra* page 12. The counterclaim defendants contend that NFC actually owes them money, because NFC has failed to credit the Coast Cities Open Account properly. They maintain that NFC is obligated to repurchase NITC parts remaining in Coast Cities' inventory, as well as a Navistar sign that Coast Cities was required to take down following termination of the dealership. *See* Gallagher Certif. ¶ 125. Finally, the counterclaim defendants insist that NFC relies on information dated up to September 22, 1992, and that the amount then outstanding had not been offset by the credits noted above, because those credits did not arise until after termination of the Dealer Agreement.

Defendants rely primarily on the affidavit of Robert D. Bradley, an officer of NFC, and Open Account statements attached thereto, as support for its position that NFC is owed a total of $127,890.31 on the Open Account. Bradley notes that as of October 31, 1993, which is the close of NFC's fiscal year, the balance on Coast Cities' Open Account was $112,628.25. Bradley Aff. ¶ 23 & Exh. C. Coast Cities had not operated as a dealer since termination of the Dealer Agreement in December, 1992, and therefore all charges and credits to the Open Account had been posted. The total as of September 30, 1993 was $115,316.07. *See id.* But there were two credits between September, 1993 and October, 1993 that brought the balance from $115,316.07 to $112,628.25. *See id.* The October, 1993 statement reflects a credit of $2490.22, which was a late charge rebate reducing the balance to $112,825.85. *See id.* Also deducted is an additional credit of $197.60. *Id.* Thus, the October, 1993 Open Account balance stands at $112,628.25.

Previously, on March 31, 1993, the Open Account balance was $98,794.69. *Id.* ¶ 24 & Exh. C. The balance grew to $130,743.09 as of April 30, 1993. *Id.* ¶ 25 & Exh. C. The increase was due primarily to two entries on the Open Account, one for $21,226.27 and the other for $11,537.94, which were parts notes on which Coast Cities' obligations had ma-

tured. *See id.* Coast Cities had initially requested NFC to finance these parts purchases over time, rather than through the Open Account. *Id.* ¶ 25.

Despite a disagreement in the bankruptcy proceeding between Coast Cities and NFC as to whether NFC would, and could, apply post-petition credits against pre-petition charges, *see Coast Cities v. Navistar Internat'l Transp. Corp. et al.,* Bankr. No. 92–33121, Adv. No. 92–3682 (1992), NFC acknowledged in February, 1993 that post-petition credits due Coast Cities exceeded post-petition charges by $46,873.73. *Id.* ¶¶ 26–27 & Exh. C. Therefore, NFC directly remitted this amount to Coast Cities. *Id.* ¶¶ 26–27. The amount of $46,873.73 reflected two separate credits: (1) $15,262.06 constituted the amount by which post-petition credits exceeded post-petition charges in the Open Account; and (2) $31,611.67 was a dealer reserve account payable to Coast Cities on a quarterly basis, minus an unpaid balance on a computer note, extended warranty contracts sold by Coast Cities, and a limited liability charge on a repossessed truck. *Id.* ¶ 27. NFC claims, however, that the $15,262.06 payment had already been credited to Coast Cities on the Open Account balance to reduce it to $98,794.69 as of March 31, 1993, but was not subsequently added to the Open Account. *Id.* Thus, NFC insists, the October, 1993 Open Account balance of $112,628.25 must be increased by $15,262.06, for a total of $127,890.31. *Id.*

The foregoing discussion renders meritless the counterclaim defendants' charge that NFC relies on information dated no later than September 22, 1992, and therefore fails to acknowledge post-termination credits. NFC has provided Open Account balance statements through the termination of the Dealer Agreement to the close of its 1992–1993 fiscal year, which is October, 1993. As to the counterclaim defendants' contention that other credits to Coast Cities' Open Account balance are outstanding, including the Navistar sign and inventory NFC must repurchase, they rely entirely on paragraph

---

**19.** The parties agree that Thomas Gallagher and Dorothy Gallagher, as co-guarantors of Coast Cities' alleged debt to NFC on the Open Account, are the proper defendants to the counterclaim.

125 of the certification of Douglas Gallagher, which states as follows:

> Coast Cities maintains that NITC and/or NFC owes it money rather than owing money to the defendants. Coast Cities is scheduled to appear before the Bankruptcy Court on January 31, 1995, to determine the amounts which are due to it as a result of NFC's failure to credit its open account properly. In addition, NFC is required to repurchase parts which remain in inventory at Coast Cities and to repurchase the Navistar sign which Coast Cities was required to take down. All of these amounts far exceed any amount claimed by NFC.

Gallagher Certif. ¶ 125. *See also* Counterclaim Defendants' Opposition to Summary Judgment at 58 (quoting Gallagher Certif. ¶ 125).

These allegations directly contradict Douglas Gallagher's deposition testimony, as follows:

> Q. Just so the record is clear, my understanding, and correct me if I'm wrong, is that the issue is not whether or not Coast Cities owes the money, the issue is whether the debtor owes pre-petition or post-petition?
>
> A. [T]hat's correct.
>
> Q. So if we forget about when the debt arose, the amount is acceptable?
>
> A. On the open account, yes.

Gallagher Dep. at 530:5 to 531:4, attached as Exh. C to Rosenberg Aff.

The Court will therefore disregard the affidavit of Douglas Gallagher to the extent it directly contradicts his deposition testimony. *See Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991); *Reitmeier v. Kalinoski*, 631 F.Supp. 565, 574 (D.N.J.1986). Moreover, the Court does not find this inconsistency to constitute a genuine issue of material fact, *Jean v. Dugan*, 814 F.Supp. 1401, 1404 (N.D.Ind.1993), *aff'd*, 20 F.3d 255 (7th Cir.1994), particularly where, as here, the counterclaim defendants have not offered anything more to substantiate their contention that NFC has not properly credited Coast Cities' Open Account. In short, the only factual support the counterclaim defendants have offered for this gauzy allegation is

paragraph 125 of Douglas Gallagher's certification. Because the claims contained therein directly contradict both his deposition testimony and the proofs submitted by NFC, the Court does not detect a genuine factual issue. *See Adams v. Madison Realty & Development, Inc.*, 746 F.Supp. 419, 424 (D.N.J. 1990), *aff'd*, 937 F.2d 845 (3d Cir.1991) (quoting *Matsushita Electric Co.*, 475 U.S. at 586, 106 S.Ct. at 1355–56)).

Additionally, Coast Cities' contention that it is owed credits for returnable inventory is unsupported and, indeed, refuted by the record. The Dealer Agreement provides in relevant part as follows:

> Upon termination of the agreement, the Company will repurchase from the Dealer service parts, as later defined, purchased as service parts from the Company under this and prior agreements and which are on hand in the Dealer's place of business on the effective date of termination. The parts subject to repurchase must be unused and in physical condition and appearance, including packaging, suitable for reshipment by the Company to other dealers. The Company will not repurchase parts whose condition may have deteriorated while in the Dealer's inventory.... but otherwise will repurchase parts listed in the Company-issued parts price list current on the effective date of termination.... The Company shall be released from its obligation to repurchase service parts if the Dealer does not submit his list of parts to the Company within 30 days after the effective date of the termination and return his parts, authorized to be returned, within 30 days after notification to return is received from the Company.

Dealer Agreement ¶ 32, attached as Exh. C to Smith Certif.

Despite the thirty-day notice provision in the Dealer Agreement, Coast Cities did not submit a list of proposed parts for return until April, 1993. Smith Certif. ¶ 7. As noted *supra*, NITC notified Coast Cities it was terminating the Dealer Agreement effective April 27, 1992. *See supra* page 4 (citing Smith Certif.Exh. N). Even if the Court were to consider the injunctive relief granted

by the bankruptcy court on July 6, 1992 and September 2, 1992, which compelled NITC to perform on the Dealer Agreement, those orders were reversed, and the Dealer Agreement terminated, on December 2, 1992. *See supra* page 5. Accordingly, Coast Cities clearly did not comply with the thirty-day notice requirement of paragraph 32 of the Dealer Agreement, thereby releasing NITC or NFC from any further contractual obligation to repurchase the inventory.

■ Finally, the Court does not find that the proceeding pending in the bankruptcy court, *Coast Cities v. Navistar Internat'l Transp. Corp. et al.*, Bankr. No. 92–33121, Adv. No. 92–3682 (1992), precludes adjudication of the counterclaims. In that proceeding, Coast Cities seeks to compel NFC to stop using the Open Account as a clearing account for charges and credits due plaintiff between May 14, 1992, when it filed for bankruptcy protection, and December 5, 1992. Coast Cities essentially wants NFC to pay any credits accruing during this period in cash, rather than allow NFC to apply those credits to the Open Account to offset prepetition charges. Consequently, if Coast Cities prevails in the bankruptcy proceeding, its obligations on the Open Account would only increase.

Accordingly, the Court will grant defendants' motion for summary judgment on the first and second counts of the counterclaims.

### III. CONCLUSION

For the reasons set forth above, the Court will grant defendants' motions for summary judgment against the Sherman Act antitrust claims in Counts I and II of the Second Amended Complaint. The Court also will grant defendants' motions for summary judgment on the state law claims contained in Counts III, IV, V, VII and VIII of the Second Amended Complaint. Additionally, the Court will grant the counterclaim plaintiffs' motion for summary judgment as to Counts I and II of the Counterclaims. Finally, the Court will deny the parties' cross-motions for summary judgment as to Count VI of the Second Amended Complaint, and will abstain from deciding the issues therein pursuant to *Railroad Comm'n of Texas v. Pullman Co.*,

312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

An appropriate form of Order is filed herewith.

### ORDER

For the reasons set forth in this Court's Memorandum Opinion, issued on this same date;

IT IS on this 29th day of December, 1995,

ORDERED that defendants' motions for summary judgment, pursuant to FED. R.CIV.P. 56, against Count I of the Second Amended Complaint are hereby GRANTED; and it is further

ORDERED that defendants' motions for summary judgment against Count II of the Second Amended Complaint are hereby GRANTED; and it is further

ORDERED that defendants' motions for summary judgment against Count III of the Second Amended Complaint are GRANTED; and it is further

ORDERED that defendants' motions for summary judgment against Count IV of the Second Amended Complaint are hereby GRANTED; and it is further

ORDERED that defendants' motions for summary judgment against Count V of the Second Amended Complaint are hereby GRANTED; and it is further

ORDERED that plaintiff's motion for summary judgment on Count VI of the Second Amended Complaint is hereby denied without prejudice, as the Court shall ABSTAIN from adjudication of this claim; and it is further

ORDERED that defendant NITC's motion for summary judgment against Count VI of the Second Amended Complaint is hereby denied without prejudice, as the Court shall ABSTAIN from adjudication of this claim; and it is further

ORDERED that defendants' motions for summary judgment against Count VII of the Second Amended Complaint are hereby GRANTED; and it is further

ORDERED that defendants' motions for summary judgment against Count VIII of the Second Amended Complaint are hereby GRANTED; and it is further

ORDERED that the motion of Counterclaim plaintiffs NFC and Harco National Insurance Co. for summary judgment on Counts I and II of the Counterclaims is hereby GRANTED.